UNITED STATES of America,

v.

Harry KURZER, Defendant.

No. 74 Cr. 288.

United States District Court,
S. D. New York.

Nov. 11, 1976.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for plaintiff; William I. Aronwald, Sp. Atty., U. S. Dept. of Justice, New York City, of counsel.

488

Neal J. Hurwitz, New York City, for defendant.

MEMORANDUM

LASKER, District Judge.

On the government's appeal from an order dismissing an indictment against Harry Kurzer, the Court of Appeals remanded for an evidentiary hearing which was held on June 11, 1976. On the basis of the evidence adduced at that hearing and the record heretofore established, we find that the government has not met its burden of proving that the indictment against Harry Kurzer did not derive directly or indirectly from testimony and evidence he provided against Moe Steinman under a grant of use immunity.

As set forth in the previous opinions of this court and of the Court of Appeals, in 1972 the federal and New York State governments were conducting an investigation of corruption in the meat-packing industry. Moe Steinman, who controlled several meatpacking companies, was a target of this investigation, but the government had been unable to indict until Steinman's accountant, Harry Kurzer, agreed in late 1972 to cooperate with the government under a grant of use immunity. Kurzer's testimony contributed substantially to the government's investigation. It led directly to a 99 count indictment filed in March, 1973 against Steinman and members of his family for income tax fraud involving a payroll padding scheme. A second indictment, not based on Kurzer's testimony, charging bribery and conspiracy to bribe was filed at around the same time. In the summer of 1973, after Steinman learned that officers of several meatpacking companies were cooperating fully with an investigation into a different tax evasion scheme involving false invoices, he agreed to cooperate with the government. A deal was arranged and Steinman eventually pled guilty to one count of a March, 1974 federal indictment for the false invoicing tax fraud, and the other federal indictments were dismissed against him and members of his family. In exchange, Steinman provided the government with information which led to the indictment of Kurzer on charges of aiding and abetting the filing of false federal corporate income tax returns.

On September 8, 1975, after an evidentiary hearing, the indictment against Kurzer was dismissed because it was found to derive from Kurzer's previously immunized testimony. The court found that Steinman would not have cooperated had it not been for Kurzer's testimony leading to Steinman's indictment. On the government's motion to reargue, a second evidentiary hearing was held at which the government attempted to show that Steinman's decision to cooperate was based solely on his learning of the third, "invoice" tax fraud investigation. At this hearing, examination of Mr. Steinman designed to elicit his state of mind at the time he decided to cooperate was cut off by the court. Once again it was found that the government had not met its affirmative burden of showing a legitimate, independent source of evidence against Kurzer not derived from his previous testimony.

The government appealed from the dismissal of the indictment. The Court of Appeals agreed that the burden on the government was to show that "information to be used against the witness [is] wholly independent" of the compelled testimony. *United States v. Kurzer*, 534 F.2d 511 (2d Cir. 1976). However, it found error in the refusal to hear and take into consideration Steinman's testimony that his decision to cooperate was based on factors entirely independent of the indictment to which Kurzer's testimony contributed. It reasoned that since the government had already focused on Steinman as a target, and thus already knew of the eventual source of Kurzer's indictment, the fact that Kurzer's testimony led to an indictment of Steinman would not in itself support the conclusion that Steinman's subsequent evidence leading to Kurzer's indictment was tainted. The court said:

"Steinman's motivation is . . . directly relevant to the central question in this case. . . . The Government

claims that Steinman would have testified against Kurzer because of the case the Government had developed against him entirely apart from Kurzer's information, even if the prior indictment to which Kurzer's information had contributed never existed. If the Government can prove that proposition to the satisfaction of the trier of fact, it has carried its burden of showing that Steinman was a source "wholly independent of the [immunized] testimony." (brackets in original) *Id.* at 517.

After hearing from both Steinman and his attorney in the above criminal indictments, Elkan Abramowitz, we find that the payroll padding indictment of March, 1973, which derived from Kurzer's testimony, contributed to Steinman's decision to provide the evidence which in turn led to Kurzer's indictment.

We credit the testimony of Steinman's attorney and Steinman himself to the extent that it finds that the precipitating event which finally triggered Steinman's cooperation with the government was his learning of the progress of the "false invoices" investigation in the summer of 1973. Moreover, we credit Steinman's description of his thought process: "Like a businessman, you got to think along them lines," that is, of what the likelihood and risks of conviction were. (Tr. at 38) We are also persuaded that at least right after the March, 1973 indictments came down Steinman was willing to go to trial on those charges, based on his estimate of the risk of conviction.

What cannot be credited is Steinman's testimony (Tr. at 22) that the March, 1973 indictments had nothing to do with his decision to cooperate, made three months later. Steinman clearly understood the seriousness of the tax fraud indictment of March, 1973. He knew he was named in "quite a few" counts—56 to be exact; that he might be found guilty of the charges if he went to trial; and that the maximum prison sentence he could receive was "a lot." (Tr. at 32–35, 37) The evidence is not persuasive that the invoice fraud investigation should

have had so much greater an effect on Mr. Steinman, standing alone, than did the 99 count indictment of March, 1973 and the companion bribery indictment. Obviously, the risks of going to trial on three different indictments increased the risk of conviction in Mr. Steinman's calculus.

This conclusion is supported by Mr. Abramowitz' testimony that the 1973 payroll padding indictment played a part in the negotiations: "if we were going to cooperate with the Government we wanted those indictments dismissed . . . it [the payroll padding indictment] played a role in the negotiations but not in the motivation and decision to cooperate." (Tr. at 8) The clear implication of this statement is that if an agreement as to dismissal of the 1973 indictment had not been worked out, Steinman's cooperation might not have been forthcoming. That being the case, it cannot be said that Steinman's decision to cooperate and provide the information which led to Kurzer's indictment was uninfluenced by, or not derived from, Kurzer's immunized testimony.

The Court of Appeals contemplated the possible difficulty of establishing the government's position through Mr. Steinman's testimony. It specifically noted that "We do not hold that should Steinman testify, as the Government has indicated he will, that the March 1973 indictments were irrelevant to his decision to cooperate, this would end the matter. The district court must determine Steinman's credibility, not only in terms of his inclination to tell the truth, but also with regard to whether he is truly able to isolate the factors which convinced him to cooperate. Human motivation is often difficult to discern, and a decision is frequently the product of several concurrent influences." At 517.

Whether Steinman was intentionally misleading in his testimony or was attempting to give a faithful recital of his own motivation is irrelevant to the matter at hand. It is worth noting, however, that Mr. Steinman's reliability as a witness is not impressive. His statements were often contradic-

tory in these hearings; he testified that the invoices investigation was the "main" reason for his decision and then agreed that there was "no other reason." (Tr. at 22) He acknowledged in a trial before Judge Werker that he "lie[d] plenty of times." *United States v. Gamaldi*, 74 Cr. 289. (Tr. at 263) As a star witness in support of the government's position in this case, his testimony simply does not sustain the affirmative burden which the law places on the government.

In short, the knowledge of the "false invoices" investigation which came to Mr. Steinman in the summer of 1973 appears to have been a significant contributing but not a sole cause of his decision to cooperate. The government has not met its burden of establishing that the padded payroll indictment of March, 1973 did not contribute to Steinman's decision to cooperate, and hence has not established that Kurzer's indictment did not derive directly or indirectly from his immunized testimony.

The indictment is therefore dismissed.

It is so ordered.