UNITED STATES of America,

v.

Louis F. PELLON, Frances Pellon, Maria Pellon Villaamil, Vincent D. Carilli, Hilton Matos, a/k/a "John," Nicholas R. Orlando, Lonnie Howard Hill, Kenneth Scherrer, Sidney Pope, a/k/a "Spencer," Jay Gray, Frank Pereira, Frank Maurice, Michael Smith, a/k/a "Frankie Royce" and Elizabeth Lugo Hayes, Defendants.

No. 78 Cr. 0164 (GLG).

United States District Court, S. D. New York.

Aug. 3, 1979.

Robert B. Fiske, Jr., U. S. Atty., New York City, by Sarah Gold, and Denise L. Cote, Asst. U. S. Attys., New York City, of counsel.

Ivan S. Fisher, New York City, for defendant Louis Pellon.

William I. Aronwald, White Plains, N. Y., for defendant Carilli.

Gary R. Sunden, New York City, for defendant Pereira.

Robert P. Leighton, New York City, for defendant Gray.

Stuart A. Holtzman, New York City, for defendant Pope.

David A. DePetris, New York City, for defendant Smith.

## OPINION

GOETTEL, District Judge:

Narcotics conspiracy investigations often reveal unusual stories, but it is doubtful that any prior case has had as bizarre a history as this one. Indeed, the scenario that has emerged from the numerous pretrial motions and lengthy hearings in this case is so extraordinary that, if submitted as a script for a movie under a title such as "The Colombian Connection," it would be summarily rejected as too implausible for consideration.

### Act I—"Pretenses and Promises"

In a sense the story started at Kennedy Airport on December 10, 1977, when some Customs officers noted that a returning passenger, who had already cleared customs inspection, was extremely nervous. The man, Louis F. Pellon, Spanish born, was ostensibly a respectable real estate developer and contractor in Westchester County. Whether his nervousness was real or feigned is debatable, but that he had reason to be apprehensive is clear. In any event, during his brief discussion with the Customs agents Pellon indicated that he might have some information about narcotics smuggling and would subsequently get together with them to discuss it. Pellon's claim of knowledge was well founded. In fact, the following day his business partner and personal associate, Vincent D. Carilli, was arrested at the Miami International Airport while returning to this country from Colombia, South America, when Customs officials found a pound of pure cocaine strapped to his body.

Pellon's proposed meeting with Customs agents did not immediately take place. Instead, both Pellon and Carilli (who was by then free on bail) talked with attorney Howard Rukeyser, who had represented their businesses in civil matters in Westchester County. Rukeyser in turn arranged a meeting with Special Agent Fred Marano of the Drug Enforcement Administration (DEA), an official with whom he had previously dealt on behalf of other clients.

By a strange coincidence, Marano was one of a group of agents who already had an undercover investigation of Carilli going in Westchester County. In October of 1977, one Harold Lane, a convicted felon awaiting sentencing on a crime not related to narcotics, had advised Assistant United States Attorney JoAnn Harris that he believed he could assist the Government in uncovering a local cocaine ring. Marano's group was assigned the matter. By December, 1977, however, the DEA agents had no indication that Carilli was a major or important drug dealer and, while they had heard that he had a Spanish partner, they knew very little about Pellon.

The meeting between Rukeyser, his clients Pellon and Carilli, and the DEA agents proved quite dramatic. After the defendants were given *Miranda* warnings, Pellon indicated that he and his partner could be instrumental in setting up the arrest of a Colombian smuggler named Ernesto Castrillion, and that Castrillion could be caught while in possession of over 500 pounds of pure cocaine. (The wholesale value of such an amount would be many millions of dollars.) Pellon also advised the agents that Castrillion and his associates owned ships and airplanes that were used to smuggle cocaine, marijuana and contraband coffee into this county.[1] Indeed, Pellon reported, the Colombians had just smuggled over a hundred pounds of cocaine into Miami.

In exchange for facilitating this exceptional seizure, Pellon and Carilli wanted the Florida charges against Carilli dropped. Although somewhat skeptical about the ability of their informants to deliver, the DEA agents were understandably excited over the prospect of catching a major Colombia cocaine dealer who, they were told, was responsible for one-third of all illicit shipments into the United States. Reluctant to play all their cards, however, the

agents did not advise Pellon and Carilli of their pending undercover investigation in Westchester.

The DEA could not independently proceed on Pellon and Carilli's enticing proposition. Carilli was already under federal indictment in Florida, and the United States Attorney's Office for the Southern District of New York was already aware, through the Lane investigation, that Carilli had sold an ounce of cocaine in this district, for which he would probably be indicted here. Consequently, a meeting was scheduled for all the parties, including representatives of the United States Attorney's Office, for December 21st.

Rukeyser and Pellon, however, without giving an explanation, cancelled that meeting. Instead, they met with the Customs agents, as Pellon had originally planned. (Carilli was not present at this meeting and no disclosure of his Florida indictment was made.) Pellon made the same offer to help the Government catch a major Colombian cocaine dealer, but his *quid pro quo* this time was different. He wanted, rather than assistance for Carilli, money and the airplane which he said Castrillion would be using to smuggle his cocaine into Florida. Pellon also told Customs that he did not want his information passed on to DEA agents because he questioned their integrity,[2] and that he wanted to trap the Colombians because they had previously bilked him out of a large sum of money and he was seeking revenge. The Customs officials, somewhat skeptical, subsequently talked with Pellon only over the telephone, and when he boldly insisted upon advance payment for his assistance and free reign to operate without interference in Colombia, they terminated their contracts with him.

Meanwhile, Pellon's continuing negotiations with the DEA agents had become difficult. He had strong ideas about how the Castrillion caper should be staged, and

1. During these discussions, there were also indications that Pellon and Carilli had been guilty of passport violations, a fact which became more apparent as time progressed.

2. A copy of a report concerning this interview was disseminated by Customs agents to the DEA, but it did not come to the attention of the DEA group then investigating Pellon and Carilli.

the agents found his intransigence unacceptable. Negotiations between them gradually broke off. Rukeyser, however, continued to negotiate on behalf of Carilli, and in February, 1978, Carilli provided the DEA and the United States Attorney's Office with some rather interesting information.

As Carilli described it, Pellon had previously been to Colombia in August, 1977, and after some unsuccessful discussions with certain Colombian cocaine dealers, he had been introduced to Ernesto Castrillion. A short time later, Castrillion visited Pellon at his home in Mt. Vernon, New York. He stayed a month with Pellon and gave Pellon a present of a half a pound of cocaine, as a showing of "good faith." (This half pound of cocaine provided the ounce which was distributed by Carilli and Pellon to Harold Lane in September of 1977.)

Carilli went on to say that Castrillion had promised to supply Pellon substantial quantities of cocaine during the latter part of that year. (Whether he did so is a matter still in dispute.) According to Carilli's story, he and Pellon went to Colombia, armed, and negotiated with Castrillion for a large quantity of cocaine. Castrillion supposedly returned to Miami in December with a substantial quantity, which was either distributed to Cubans in Miami, or to Pellon.

Prior to his cooperation with DEA, Carilli had indicated to Lane and other undercover DEA sources that he thought he might be in a position to deliver substantial amounts of cocaine in the near future. The agents also had information that Carilli's father, Armand, was involved in the drug trade. In February, when Carilli disclosed his prior activities to the prosecution, the agents did not reveal to him that his story was partially corroborated by their independent undercover investigation.

At the same time that Carilli was supplying the information concerning his and Pellon's cocaine activities, the United States Attorney's Office placed Harold Lane be-fore a Grand Jury. Lane described his cocaine transactions with the Carillis and Pellon, including the delivery of the one ounce of cocaine in 1977, and the boasts of their ability to deliver substantial amounts in the future. Assistant United States Attorney Harris, although interested in the possibility of developing a larger case, was unwilling to take any steps that might unnecessarily prejudice the cases already secured through Lane's testimony against Pellon and Carilli. Moreover, by this point it had become apparent to everyone involved that only Pellon, if anyone, had the ability to set up the arrest of Castrillion, and Pellon was no longer cooperating with the Government. (Even attorney Rukeyser could not control Pellon's actions during this period.)

The Government thought it had a solution to the problem. With Carilli's statements (which had been tape recorded) and the testimony of Harold Lane, supported by recordings of his telephone conversations with Carilli, the Government felt it had sufficient evidence to indict Pellon, with the possibility that this leverage might induce him to cooperate more readily. The assumption was that Carilli, in order to get his plea bargain in Florida, would be willing to testify against Pellon. In discussions with Carilli, Ms. Harris had orally agreed to help him with respect to his Florida case in return for his cooperation, and had told him that his testimony must be full, complete and straightforward. She also specifically had declined to promise that Carilli's information would not be used against Pellon. Carilli had also been advised that a written cooperation agreement to this effect would be signed.[3]

The Government's assumption that Carilli would testify against Pellon proved erroneous. Rukeyser failed to produce Carilli for further interviews in the United States Attorney's Office, or for an appearance before the Grand Jury, and Ms. Harris was advised that Carilli had gone to Florida in an effort

---

3. Because of Rukeyser's urging, however, the debriefing of Carilli had gone forward without a written agreement. Eventually, one of the Government's standard cooperation agree-ments was drafted, but because of Carilli's subsequent failures to cooperate, it was never sent to Carilli.

to work out a new and better deal there for himself. Ms. Harris told Rukeyser that the Government would proceed without Carilli.

A complaint was prepared for the arrest of Pellon in mid-February, 1978. It was based solely upon the statements of Carilli, the Government having up to that point concealed from the defendants its parallel investigation involving informant, Harold Lane. The complaint was filed and Pellon surrendered voluntarily, appearing without an attorney. He was interviewed by Ms. Harris and, in essence, admitted knowing a lot about the cocaine trade, but denied personal involvement. He also specifically refused to answer a number of questions. Efforts were again made to get Carilli before a Grand Jury, but he continued to be unavailable. At the same time, the DEA became aware, for the first time, that the Mt. Vernon Police Special Investigation Unit had an active narcotics investigation of Pellon and Carilli. Rather than cooperating with the police and pooling information, however, the DEA stubbornly told them to take no steps that might interfere with the ongoing federal investigation.

Carilli's recalcitrance notwithstanding, the Government forged ahead and obtained an indictment against Pellon by placing DEA Agent Marano before the Grand Jury. He described Carilli's earlier statements incriminating Pellon in cocaine transactions, as well as certain passport violations.[4] Immediately prior to doing this, however, Harris advised Rukeyser about the additional evidence from the undercover investigation which could be used against Pellon. The indictment was returned on March 7th, charging Pellon with a narcotics conspiracy, possession of the half pound of cocaine received from Castrillion in August of 1977, the distribution of the one ounce of cocaine to Lane, and one passport violation. Carilli was named as an unindicted coconspirator.

The Government continued its efforts to bolster its case against Pellon by bringing Carilli before a Grand Jury. Ms. Harris became convinced that Carilli's whereabouts were being concealed by attorney Rukeyser and Pellon, for Pellon's benefit. In fact, Carilli had returned again to Florida with Pellon and they had become involved in some unusual transactions that were soon to become known, at least partially, to the prosecution.

On March 14, 1978, having returned hastily from Florida, Carilli was finally called before a Grand Jury. He appeared with a new actor in the drama, Florida attorney Jack Attias, who was representing Carilli on the federal charges in that state. Carilli acknowledged recently having been in Miami with Pellon, denied that there had been a concerted effort to keep him from appearing before the Grand Jury, but claimed privilege with respect to certain events which had occurred during his travels. A couple of days later, immediately prior to Pellon's arraignment on the indictment, Pellon appeared with both Attias and Rukeyser, and the attorneys informed the United States Attorney's Office that they were jointly representing both Pellon and Carilli in their existing legal problems. They again offered cooperation and proposed the deal that had been discussed a few months earlier. This new conciliatory effort, of course, did not surprise Ms. Harris since she acknowledged that indicting Pellon might put "leverage" on him to cooperate.

As the discussions became more serious, the Chief of the Narcotics Unit of the United States Attorney's Office, James Lavin, entered the picture. The Government attorneys were informed that Castrillion was in Florida and that he could be caught with 100 to 200 pounds of pure cocaine, as well as, perhaps, his airplane. They were also told, however, that it was urgent that a deal be struck quickly since the cocaine was being rapidly sold. In exchange for their help, the defendants wanted Pellon's indictment dropped, no additional charges here against Carilli or his father, and assistance

4. Pellon had a lady friend named Elizabeth Lugo Hayes, a codefendant in this case. Mrs. Hayes was apparently married at one time to William Joseph Hayes. Pellon had obtained his passport and was using it on occasion, as well as having obtained a new passport for himself (claiming he had lost his one), while also giving one of these passports to Carilli.

with respect to the Florida prosecution of Carilli. The defendants did not explain, nor surprisingly did the United States Attorney's Office inquire, how they knew of Castrillion's presence in Florida, the exact amount of cocaine present, or the rate at which it was being sold.

These facts were not to remain a complete secret long. A day or two later, while the prosecution was in the process of preparing a cooperation agreement, it learned from the Mt. Vernon police that a warrant had been issued in Dade County, Florida, charging Pellon and Carilli with conspiracy to commit murder and conspiracy to violate the state narcotic laws. The DEA and the Mt. Vernon police cooperated in the arrest of the defendants on the warrant. They learned that the Dade County charges stemmed from an alleged attempt to rip off a large amount of cocaine and to murder the supplier, apparently to avoid paying for it. Further investigation revealed that on March 13th, following a tip from an informant, Dade County authorities had arrested certain associates of these defendants, including Sidney Pope, a defendant in this action, aboard a pleasure fishing vessel in the inland waterway in Miami. At that time the police found several weapons and some heavy chains aboard the vessel which quite plainly would have been suitable for dumping bodies overboard.

After their arrest, Pellon and Carilli immediately denied any intent to be involved in a murder and claimed that the events in Florida were simply a part of their continuing good faith effort to set up Castrillion's arrest. They claimed, moreover, that the evidence against them on the murder charge was weak and that the case would not be prosecuted in Dade County. They waived extradition and returned to Miami.

Apparently the Dade County authorities confirmed that the case against Pellon and Carilli was weak.[5] Between this time and April 5th the Government became convinced that the representations of Pellon and Carilli were correct and that the Dade County charges notwithstanding, the plan to apprehend Castrillion and the cocaine could forge ahead. To be on the safe side, however, the Government, on March 30th, presented to the Grand Jury in the Southern District of New York additional evidence sufficient to indict Carilli and his father for the prior narcotics conspiracy, and to add additional passport charges against Pellon. Although the Mt. Vernon police had just collaborated on the arrests, they were not asked to provide the federal agents with the results of their ongoing investigation which, by this time, had produced more evidence that could have been used against Pellon and Carilli.[6] In any event, no new indictment was filed against the defendants.

*Act II—"Striking A Hasty Bargain"*

The negotiations with the defendants accelerated. On April 1st, Florida attorney Attias mailed a draft of a cooperation agreement to New York attorney Rukeyser and arrangements were made for a meeting on April 5th among all interested parties. Attias' proposal was quite broad and would have immunized the defendants "for any past or present activities . . . in connection with the violation of the narcotics laws." This suggestion was patently unacceptable to the United States Attorney's Office, since it was understood that the defendants had not divulged all of their prior illegal activities. Indeed, such incidents as the Miami fishing boat adventure

---

**5.** The Dade County authorities had problems with the initial arrest and search, which was based upon a tip from a confidential informant whose identity they wished to conceal. Pellon and Carilli were not apprehended at the time of the search. While one person aboard the vessel made a confession implicating them, he subsequently claimed it had been coerced. The Miami seizures have also been the subject of a suppression motion by defendant Pope in this case. *See* Memorandum Decision, 79 Cr. 164 (S.D.N.Y. June 28, 1979).

**6.** Interestingly, while the Drug Enforcement agents remained unaware of the prior dealings between Pellon and the Customs agents, the Mt. Vernon police were aware of them and had previously offered their cooperation to the Customs officers.

were clear indications of suspicious, unexplained activities by Pellon and Carilli. Moreover, an agreement was difficult to draft because only certain of the criminal activities known to the Government had already been the subject of indictments.

While the attorneys were arguing over the terms of the agreement and the draft was being hastily revised, constant pressure was put on the Government to conclude the agreement as soon as possible since the defendants claimed that Castrillion's cocaine supply was fast being distributed. According to Pellon, it had already dwindled to about 25 pounds. Again, the Government did not inquire how the defendants were able to keep daily track of Castrillion's alleged Florida transactions.

In addition to Assistant United States Attorneys Harris and Lavin, the Chief of the Criminal Division, Fred Hafetz, was brought into the discussions. They made a number of last-minute changes in the agreement and, at the last moment, Hafetz added a "breach provision" covering the possibility that the defendants would not live up to their end of the bargain. The agreement was then executed by the parties and their attorneys.

Although vague and incredibly badly drafted, the agreement provided that the defendants would "cooperate, supply information and work with the [U.S. Attorney] and the DEA" in the investigation of one Ernesto Castrillion. The defendants further agreed to follow any and all directives from the United States Attorney's Office and DEA regarding the investigation, and to testify in any resulting criminal trial, if necessary. (The plan was to avoid having them testify, if possible.)

In consideration of the defendants' "truthful cooperation," and so long as their cooperation led to the arrest of Castrillion and the confiscation of 25 pounds of cocaine, the Government agreed not to prosecute Pellon on the then pending charges against him and, as to Carilli, the Government agreed to inform the sentencing judge in Florida of Carilli's cooperation. The Government also agreed, under the above conditions, not to bring "any further charges against Louis F. Pellon, Vincent D. Carilli or their families for any violations of the narcotics laws or passport laws . . . presently known to the USA and DEA."

Under the agreement, if Castrillion was not arrested with an appropriate seizure of cocaine, then the Government would be free to prosecute Pellon under the pending indictment, and to bring any additional charges "which [were] not connected with the activities" of Pellon and Carilli "in their cooperation with the Government."

In sum, the agreement provided the defendants with what loosely could be characterized as "immunity" in three respects: 1) Pellon was not to be prosecuted on the existing Southern District indictment. (Carilli was merely to get assistance with respect to sentencing on his Florida charge, as to which he had recently pled guilty); 2) neither Pellon, Carilli, nor their families, were to be prosecuted "for any violation of the narcotics laws or passport laws of the United States of America [then] known to the USA and DEA"; and 3) neither of them were to be prosecuted for their activities "in their cooperation with the Government."

The first aspect can clearly be viewed as a simple nonprosecution agreement. The second aspect, since the additional activities then known to the Government were not spelled out in the agreement, has a vaguely immunizing character.[7] Both of these ben-

---

7. In so doing, the Assistant United States Attorneys were violating the January 18, 1977 instructions of the Attorney General concerning preparations of agreements not to prosecute in return for cooperation. These instructions emphasize the need for learning all of the facts in order to weigh the relative culpability of the persons involved, and they direct the prosecutor to insist upon an offer of proof. Moreover, the instructions direct the attorney for the Government not to enter into such an agreement without explicitly limiting the scope of the Government's promise to specific charges, to insure that the agreement not to prosecute does not confer a "blanket" immunity on the witness. These instructions also require preparation of a written agreement which is sufficiently detailed to leave no doubt about the obligations of the parties under the agreement.

efits, of course, were conditioned upon the ability of the defendants to produce Castrillion for arrest and confiscation of approximately 25 pounds of cocaine.

The need for the final protection, which was not conditioned upon a successful venture, is not immediately apparent. In acting as undercover informants, their actions should not have been considered criminal even if ostensibly so. Moreover, the use of the phrase "in their cooperation with the Government," (which changed Attias' original language which was "in effectuating the intents and purposes of this agreement") leads to the defendants' current contention that they were immunized as to all matters involved in their cooperation with the Government, including the information supplied prior to the written agreement.

For that matter, the "breach provision," which astonishingly had to be tagged on at the last minute, states simply that the agreement "is premised upon truthful cooperation during all phases of this investigation, including any Grand Jury or court proceedings which may arise . . . ." "Truthful cooperation" is a phrase unique to this particular cooperation agreement. It might represent a shorthand expression for the usual promise of truthful testimony and full and complete cooperation. However, it seems to have been intended to require merely that the defendants, in the future, keep the United States Attorney's Office and the DEA agents fully apprised of what they were doing in arranging Castrillion's arrest.

No one has explained why the Government did not use its standard form of cooperation agreement. That agreement requires a full and complete disclosure of all prior criminal acts and truthful testimony in the future, as well as a promise not to commit any criminal acts in the future. A failure in any respect voids the agreement and leaves the Government free to prosecute the witness and to use his prior testimony against him. The testimony of the Government attorneys involved in this case indicated that the combination of the unique circumstances existing at the time of the agreement, and the time pressures involved in consummating it, led to the use of an agreement drafted by defense counsel and modified by them. In their opinion, they were agreeing to give up only those violations (prosecutable matters) already known to them and already presented to a Grand Jury although not in all instances reduced to indictments. They acknowledge, however, that they have never before or since been involved in an agreement of this nature and that it is quite unique. In any event, it is apparent that, despite many striking warning signals, the Government's representatives were lulled into believing that they were dealing with some relatively insignificant local contacts for a major foreign narcotics smuggler. That their assumption was unfounded was soon to become apparent.

### Act III—"Revelation and Revenge"

On April 19, 1978, as a result of Pellon's and Carilli's cooperation, Ernesto Castrillion was arrested in New York City in possession of approximately 26 pounds of almost pure cocaine, the largest seizure made in the New York area in some time. Although Pellon assisted them in gaining entry to Castrillion's apartment, the agents attempted to conceal the fact that Pellon and Carilli had arranged the arrest. After his arrest, Castrillion made statements indicating his bewilderment as to why he had been told to bring the cocaine to New York and implying that it belonged not to him but to Pellon. His protestations were not taken too seriously by the Government representatives, although taped conversations that occurred before the arrest indicated that Pellon had to pay Castrillion $5,000 to entice him to bring the cocaine to New York. With these explanations, Castrillion attempted to make a separate deal of his own with the DEA concerning still other confederates, but with such a fine-feathered bird in the hand the DEA was not interested in his proposal.

As Castrillion's trial came on in June of 1978, the Government started to have difficulties dealing with Pellon. The prosecution had intended to avoid calling Pellon and Carilli as witnesses if possible, but certain exigencies seemed to require their appearance. As a result Pellon specifically requested formal use immunity concerning anything he might testify to at trial. He manifested an awareness that he had no full testimonial immunity at that time. Attorneys Rukeyser and Attias also attempted to obtain formal use immunity for both clients, but their requests were refused, and the prosecutors indicated confusion as to why immunity should be necessary. When defendants' attorneys complained that the protection provided by the April 6th agreement was not sufficient to cover all possibilities, it was pointed out to them that they had originally drafted the agreement, and that if there were other potential liabilities involved they should have covered them at that time. Pellon continued balking to such an extent that he was not called as a prosecution witness at trial, but rather appeared at the defendants' request. Carilli testified for the Government, but at some points during their testimony both Pellon and Carilli claimed their Fifth Amendment privilege.

Castrillion was convicted and sentenced to nine years' imprisonment. In early August the Government obtained a dismissal of the Southern District indictment against Pellon, although filing a disclaimer indicating that it was not satisfied with his cooperation.

In September, shortly after being sentenced, Castrillion apparently finally realized who had been responsible for his downfall and, not to be outdone, he, too, entered into a cooperation agreement with the Government. He advised the United States Attorney's Office that Pellon and his associates were not minor retailers in an illicit distribution chain, but were, in fact, major cocaine operators who had successfully imported and sold over 500 pounds of pure cocaine in the previous year. Moreover, with respect to his arrest, Castrillion advised the Government that the 26 pounds of cocaine seized had previously been sold to Pellon (although not paid for) and was only a minute portion of the total Pellon had received. Castrillion, no doubt enjoying the surprise and chagrin he was causing, also stated that Pellon was continuing his narcotics business and was at that moment in the process of arranging a multi-million dollar deal with another Colombian cocaine smuggler.[8]

Amazingly, but with an apt sense of irony, within a few days after making these revelations Castrillion departed from this drama by escaping from the Metropolitan Correctional Center in New York City. Needless to say, he has not been seen or heard from since.

### Act IV—"Combined Counterstrike"

Through other confidential sources, and with a "reassessment" matters previously known in light of Castrillion's information, the Government became convinced that it had been hoodwinked by Pellon and Carilli. After consultation with the Mt. Vernon police, and a frank exchange of information in its possession, a joint federal-state investigation was commenced. This investigation, an understandably vigorous one lasting several months, included the use of a number of state-ordered wiretaps and bugs planted in Pellon's Westchester warehouse.

Allegedly Pellon and his associates were not unaware of the shift in their fortunes. In fact, they are now charged with enlisting the assistance of a member of the Mt. Vernon police (defendant Frank Maurice) to keep them regularly informed of the progress of the new investigation. They also allegedly hired an electronics company to sweep their premises for any trace of electronic surveillance and, in a rather audacious tactic, they allegedly retained their own bugging expert in an attempt to over-

8. Apparently this other Colombian cocaine smuggler, one Gustave Davilla, was a friend of Castrillion who was willing to forego his own profits in order to assist Castrillion in gaining revenge upon those who had betrayed him.

hear discussions in the Mt. Vernon police headquarters. By December they had apparently become aware of both the wiretaps and the existence of a bug, which they detected and rendered inoperable. At this point, the Government, which had been awaiting a major delivery from Colombia before making arrests, moved in with a number of state-authorized search warrants seizing little cocaine, but finding substantial documentary evidence and some weapons.

Initially, only a variety of state charges were brought against Pellon, Carilli, and certain of their associates. About a month later, however, this voluminous federal indictment, against fourteen defendants, was filed. The conspiracy charge, Count I, charges 50 overt acts, at least 15 of which are alleged to have occurred before April 6, 1978 (the date of the cooperation agreement). Count 2 charges Pellon with a continuing criminal enterprise beginning in January, 1978. Count 3 charges Pellon and Carilli with a substantive narcotics violation occurring on March 7, 1978. Counts 8–10 and 11–12 charge Pellon and Carilli respectively with perjury in their testimony at the trial of Castrillion.

The overt acts in the indictment charge that Pellon and Carilli received 200 pounds of cocaine from Castrillion in Florida in early March, 1978, counted and repacked it, and then transported 100 pounds of it to Westchester County where, in early March and April, it was moved to a number of different locations. On March 12th, it is alleged, they agreed with Sidney Pope that he would kill Castrillion and another Colombian in order to avoid the traditional requirement of paying for the cocaine (the Florida boat incident). Thereafter, during April and May, while they were supposed to be acting as Government undercover informants, they allegedly disposed of large amounts of cocaine and pocketed the proceeds. The indictment charges that during this same period the defendants transferred large sums of money from the United States to various bank accounts in the Bahamas. In addition, the state-ordered wiretaps apparently confirmed an attempt to import as much as an additional half ton of cocaine into the United States and also indicated that Pellon ran a narcotics distribution network with bases in Miami, Los Angeles, New Jersey, North Carolina, Georgia and Virginia.

### Act V—"The Legal Legacy"

In the most substantial of the numerous pretrial motions in this case, Pellon and Carilli move to dismiss the indictment or, alternatively, to suppress all the evidence gained through the wiretaps and bugs. The basis for their motion is the April 6, 1978 cooperation agreement, which they argue immunizes them from this prosecution and forbids the prosecution's use or derivative use of their prior disclosures. Because Pellon and Carilli also assert that their cooperation with the Government will be their chief defense at trial, several of the other defendants move for severance, claiming that the assertion of such a defense will prejudice them. Additional severance motions on other grounds have also been made.

### A. The "Immunity" Motions

Because of the unusual nature of the agreement, and the various interpretations of it offered by the parties, a lengthy hearing was necessary to develop the circumstances surrounding the negotiation and execution of it.

In the agreement, the Government makes an explicit promise not to bring any charges against these defendants for "any violations of the narcotics laws [then] known to the USA and DEA," as of April 6th. As stated earlier, many of the overt acts and several substantive charges in the present indictment allegedly occurred before that date, and the defendants' initial argument is that since the Government knew of some of these events, this prosecution is barred by the agreement.

The fallacy of the argument is apparent. The agreement did not contain a promise by the Government not to use *any* of the information that had been developed prior to April 6th, but only promised not to prosecute for certain known violations of the law. Although what the Government

"knew" as of April 6th is not facially clear from the document, on the basis of the evidence adduced at the hearing it is clear that the parties intended to protect the defendants from the charges in the pending Pellon indictment, to which Carilli and his father could have been added as named defendants, plus the additional passport charges which could have been added, and on which the Grand Jury had already heard testimony. These were the "known" violations which concerned the parties in April, 1978.

Although the Government also had some information on other disconnected events, for example the Miami boat seizure, it did not have any awareness of the surprising conspiracy now alleged in this indictment. Therefore, while the prosecution knew of certain events, otherwise innocuous on their face, it did not have enough information to place those events in context as overt acts in a narcotics conspiracy. Merely because some of the overt acts alleged in this indictment occurred before April 6, 1978 does not mean that the Government knew at that time that the defendants were engaged in a different and larger conspiracy simultaneous with their efforts to set up the arrest of Castrillion. Since the agreement immunizes only "known violations," the defendants cannot be protected from this indictment on the theory that some relevant information, otherwise innocent, was known by the prosecution on April 6th. It was not until Castrillion began to cooperate, after his conviction, that the Government attorneys began to realize that they may have been double-crossed by the defendants' pursuit of an undisclosed conspiracy right under their noses.

This finding about what was known to the Government as of April 6th notwithstanding, the defendants assert a more interesting alternative theory to protect them from this prosecution. This theory is based on *United States v. Kurzer,* 534 F.2d 511 (2d Cir. 1976). In *Kurzer,* the defendant had previously supplied information, on an assurance of use immunity, about the criminal activities of one Moe Steinman. Eventually, Kurzer was granted formal use immunity under 18 U.S.C. § 6002, and testified against Steinman in the Grand Jury. After Steinman was indicted, he began to cooperate with the Government and supplied new incriminating information about Kurzer, and Kurzer was then indicted on this basis.

The Second Circuit, although remanding for further hearing, held that if Kurzer's immunized testimony had effectively "caused" Steinman's cooperation, the indictment against Kurzer could not stand. This conclusion followed since, under those circumstances, Steinman's testimony was "indirectly derived" from Kurzer's own immunized testimony, and as such, was barred under the immunity grant. 534 F.2d at 515; *see* 18 U.S.C. § 6002. Because Kurzer was compelled by a grant of use immunity to testify in the face of his Fifth Amendment privilege, he must be left in "substantially the same position as if [he] had claimed the . . . privilege." 534 F.2d at 516, *quoting Kastigar v. United. States,* 406 U.S. 441, 462, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). On remand, the district court adhered to its earlier holding that Steinman's cooperation had been induced by his indictment and therefore was the product of a derivative use of Kurzer's immunized testimony, and dismissed the indictment against Kurzer. 422 F.Supp. 487 (S.D.N.Y. 1976).

Simply stated, Pellon and Carilli argue that Castrillion is to them as Steinman was to Kurzer. They contend that the information they disclosed and the actions they took in facilitating Castrillion's arrest should be afforded a "use immunity type" shield, so that Castrillion's incriminating disclosures about them are barred as the indirect product of their own cooperation. Since the wiretap evidence in this case was based in substantial part on warrants supported by Castrillion's information, the defendants also argue that the evidence should be suppressed as the result of an illegal use of their own prior disclosures and cooperation.

To make this argument, of course, the defendants must first establish that a type of use immunity existed for their disclo-

sures to the Government in the spring of 1978.[9] This they have tried to establish in two ways. First, they contend that the April 6th agreement contains an implicit grant of use immunity, and second, that even if it does not, the agreement in effect gave them a type of "transactional" immunity, which by definition includes the equivalent of use immunity. *Cf. United States v. Quatermain,* 467 F.Supp. 782 (E.D.Pa.1979), *appeal docketed,* No. 79–1253 (3d Cir. Feb. 26, 1979). In short, since their cooperation resulted in the Government seizing Castrillion and 26 pounds of cocaine, the Government cannot now use Castrillion's information to prosecute them.

■ The difficulty with the first branch of the argument is that nowhere in the agreement does the Government promise anything approaching use immunity in the usual sense. If the prosecution had made such an explicit promise in return for testimony, of course, it would be enforceable to the same extent as a formal grant of immunity under section 6002. *See, e. g., United States v. Kurzer, supra,* 534 F.2d at 513 n.3; *United States v. Galanis,* 429 F.Supp. 1215 (D.Conn.1977), *rev'd on other grounds,* 568 F.2d 234 (2d Cir. 1977) (habeas petition). *See also United States v. Nussen,* 531 F.2d 15 (2d Cir.), *cert. denied,* 429 U.S. 839, 97 S.Ct. 112, 50 L.Ed.2d 107 (1976).

In the instant case, however, the evidence does not support the conclusion that the Government made such a promise to these defendants. Initially, it is apparent that their cooperation was not "compelled" from them over their invocation of the Fifth Amendment. They approached the Government voluntarily, and bargained for as much as they could get in return for their information. They received dismissal of an indictment and a promise not to bring certain other charges, and for these benefits, they were willing to cooperate. In addition, at the time the agreement was signed, there was no intention to have the defendants' testify at Castrillion's trial, so that a testimonial protection was not seen as a necessity. Further, the Government knew that it was not aware of all the criminal histories of these defendants, and a request for full-fledged use immunity, even if one had been made at the time, would probably not have been acceptable to the Government.

■ Similarly, the promise by the Government not to prosecute the defendants for any activities "in their cooperation with the Government" was clearly intended only to assure the defendants that they would not be prosecuted for anything they did at the direction of the DEA in aiding the arrest of Castrillion and the seizure of the cocaine.[10] The phrase was not intended to apply to all the previous bits and pieces that the defendants had supplied to the Government up to that point, nor can it be characterized as providing "transactional immunity" as that term is generally understood. Transactional immunity, like use immunity, is generally offered by the Government in return for testimony that, because of the witness' Fifth Amendment privilege, would be otherwise unavailable. The difference between transactional immunity and use immunity is that in the former, the witness is protected completely from prosecution for any offense about which he testifies. Use immunity is not as broad; it precludes only the Government's use of the testimony, and the witness may still be prosecuted if the prosecution can prove its case independently of the witness' own testimony. *See generally Kastigar v. United*

---

**9.** Unlike *Kurzer,* in this case the Government has not disputed the chain of causation between Castrillion's conviction and his motive to incriminate Pellon and Carilli. Therefore, if Pellon and Carilli *did* enjoy a full use immunity for their disclosures, under *Kurzer* Castrillion's information would be an indirect product of the defendants' disclosures.

**10.** As mentioned earlier, it is unclear why such a promise of nonprosecution was even necessary, for by definition, if the defendants were acting under the direction of Government agents, they would not have the necessary intent to be guilty of criminal offenses. Nevertheless, Pellon and Carilli wanted such a promise in the agreement, and the Government went along using the vague phraseology: "in their cooperation with" the Government.

*States,* 406 U.S. 441, 449–53, 92 S.Ct. 1653 (1972).

■ In any event, the Government's promise in this case, not to prosecute for certain known offenses or for actions aiding in Castrillion's arrest, clearly do not amount to a promise of transactional or use immunity. *But cf. United States v. Quatermain, supra.*[11] Concerning disclosures made before April 6th, the agreement cannot reasonably be interpreted as a promise of retroactive use and derivative use immunity.[12] As to events expected to occur after April 6th, the need for a testimonial immunity was simply not apparent, nor was it requested. Indeed, under the agreement the defendants were not required to incriminate themselves through their own testimony or actions; they were required only to help in the prospective arrangements for the arrest of Castrillion. The Government's promises simply do not amount to a guarantee that anything derived from that arrest could not later be used against the defendants.

Moreover, the defendants' post-agreement conduct belies their present claim of immunity. Both defendants made specific requests for formal use immunity when it became apparent that they might testify at the Castrillion trial, indicating their awareness that the April 6th agreement did not provide such complete protection. Both requests were refused. Finally, both defendants in fact invoked the Fifth Amendment at Castrillion's trial whenever the questions called for incriminating responses outside the scope of Pellon's prior indictment, on which they knew they would not be prosecuted. While the prosecutor at that trial argued that Pellon and Carilli could not invoke the privilege about the transactions alleged in the prior indictment, he did not dispute their invocation of it in any other respect, and certainly did not represent to the court that the defendants would be protected from prosecutorial use of anything they said.

Even with the help of *Kurzer,* therefore, Pellon and Carilli are not protected from this prosecution because they never received a promise of full use immunity for their disclosures to the Government. Instead, what they bargained for and what they received was a simple agreement not to prosecute certain known violations in return for their cooperation. In other contexts, courts have recognized that a promise not to prosecute, in return for cooperation and testimony, is not the equivalent of the broad immunity required constitutionally to compel a person to testify over a claim of privilege. *See e. g., United States v. Jenkins,* 470 F.2d 1061 (9th Cir. 1972), *cert. denied,* 411 U.S. 920, 93 S.Ct. 1544, 36 L.Ed.2d 313 (1973); *Earl v. United States,* 124 U.S.App.D.C. 77, 361 F.2d 531 (1966), *cert. denied,* 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967). The defendants' argument, if accepted, would elevate every simple nonprosecution agreement to the level

11. In *Quatermain,* now on appeal to the Third Circuit, the defendant had voluntarily offered his cooperation against his future incriminator in return for a vague promise of "immunity from prosecution" for his participation in crimes "relating to the manufacture of methamphetamine." 467 F.Supp. at 787. The court held this open-ended promise to be the equivalent of a grant of full transactional, and use, immunity. There were apparently no charges against the defendant pending at the time of his agreement, however, so that the Government's promise termed explicitly as "immunity," was even more vague than the one in this case. Moreover, the Government seems to have conceded in that case that that agreement provided a testimonial immunity (indeed, insisting that it was "use immunity"), but also took the inconsistent position that the immunity was somehow limited to a particular subject matter. *See*

*id.* at 787 & 788. Finally, the defendant was not represented by counsel at the time of his negotiations, and the court was willing to construe ambiguities in his favor.

For these reasons, *Quatermain* is distinguishable. If it may be interpreted as equating simple nonprosecution agreements with grants of full-fledged testimonial immunity, however, this Court respectfully disagrees.

12. In addition, during his testimony at Castrillion's trial, Carilli clearly indicated his belief that, up until April 6th, he had no agreement in effect with the Government. He admitted fabricating parts of his pre-April 6th disclosures, because he "did not feel obligated to tell the truth at [that] time since I had no agreement with the DEA."

of a full grant of testimonial immunity. Such a conclusion would be unprecedented and untenable.

These defendants offered their cooperation to the Government voluntarily and with full knowledge of what they were promising and what benefits they would receive. They were not compelled, over their invocation of the Fifth Amendment, to do anything that they did not willingly agree to do. Under these circumstances, the defendants got what they bargained for, and deserve no more than that. *Cf. United States v. Stirling,* 571 F.2d 708, 732 (2d Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978) ("[O]nce the agreement is finalized its terms will be enforced.").[13] While one would expect better draftsmanship in important prosecutorial agreements, and more prosecutorial prudence before "striking a bargain with the devil," the shortcomings of the prosecutors do not warrant letting the wrongdoers go free.

■ The Government also argues that even if the agreement were construed to afford the defendants use immunity for their disclosures and cooperation, they breached the agreement by not cooperating fully and truthfully. Under this rationale, the Government contends that the agreement becomes void, and the defendants can be prosecuted for any and all of their crimes. Since a pretrial attempt by the Government to establish this claim would effectively require proof of the prosecution's entire case against the defendants (which it is estimated will take a month or more), the Government has not pursued this argument at this time. Nevertheless, it may well be that after trial, the Court will be in a position to evaluate this additional contention and rule on it. Accordingly, the Court will reserve decision on this alternative ground until the trial has concluded and the parties have been given an opportunity to submit briefs on the issue.[14]

For the foregoing reasons, the defendants' motions to dismiss and to suppress, on the basis of the April 6th agreement, are denied.

### B. *The Severance Motions*

Four defendants, Michael Smith, Frank Pereira, Sidney Pope and Jay Gray, move for severance under Fed.R.Crim.P. 14. All of them assert that they were minor players in the drama and that the "spill-over" from the evidence against the more culpable defendants will prejudice them. Smith, Pereira and Pope also assert that Pellon and Carilli's defense of cooperation with Government agents will be antagonistic with their defenses. Finally, Smith claims that if there were separate trials, Pellon and Carilli would offer testimony exculpating Smith.

■ As to the "spill-over" ground, the defendants' assertions are no more than the usual claims that they might fare better if severed. *See United States v. Stirling, supra,* 571 F.2d at 733. None has met the "heavy burden" of showing clearly that substantial prejudice will result from a joint trial, or that the jury, properly instructed, will be unable to measure guilt or innocence separately as to each defendant. *See United States v. Ricco,* 549 F.2d 264, 270–71 (2d Cir. 1977); *United States v. DeSapio,* 435 F.2d 272, 280 (2d Cir. 1970), *cert. denied,* 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971). In short, none of the defendants has made a showing sufficient to cause "abandonment of the general rule that persons jointly indicted may be jointly

---

**13.** Apparently because the Government has not stated that it intends to offer at trial any of the prior statements of the defendants made during the negotiations, defendants have not raised an argument under Fed.R.Crim.P. 11(e)(6) and Fed.R.Evid. 410. *See generally United States v. Robertson,* 582 F.2d 1356 (5th Cir. 1978) (en banc); *United States v. Arroyo-Angulo,* 580 F.2d 1137 (2d Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1979).

**14.** Although a defendant who breaches an immunity agreement generally may be prosecuted only for perjury in his testimony, *see Kurzer,* 534 F.2d at 518, the breach of a simple plea bargain or nonprosecution agreement may lead to different consequences. *See, e. g., United States v. Stirling,* 571 F.2d 708 (2d Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978).

482

tried . . . ." *United States v. Lyles,* 593 F.2d 182, 191 (2d Cir. 1979), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). Of course, the Court will reconsider its ruling in this regard should any new facts in support of defendants' positions develop prior to, or at trial.

■ A similar conclusion must be reached as to the claims of antagonistic defenses. Of the defendants who make this argument, only defendant Smith sets forth what his allegedly inconsistent defense will be, namely, he will admit to certain transactions alleged in the indictment, but will deny the criminal intent necessary for guilt.

It is difficult to see how this defense would be antagonistic to Pellon and Carilli's alleged defense that they were operating as undercover agents for the Government. Indeed, the defenses do not seem antagonistic at all on the facts as contended in support of the motion. The other defendants do not even state what their allegedly antagonistic defenses will be. Under these circumstances, there is no basis for granting a severance.

■ Finally, defendant Smith contends that at a separate trial, Pellon and Carilli would testify on his behalf. This presents the most troublesome severance issue. The Government properly points out, however, that Pellon and Carilli, in their affidavits in support of Smith's motion, do not state explicitly that they would waive their Fifth Amendment privilege at a separate trial of Smith. Instead, they state only what their allegedly exculpatory testimony would be. Even assuming that their direct testimony would be probative in countering the Government's evidence against Smith,[15] their failure to waive the privilege generally could so restrict cross-examination that their direct testimony should not be considered. Without a guarantee that they would waive the privilege, of course, the value of the testimony is speculative. *See,*

e. g., *United States v. Finkelstein,* 526 F.2d 517 (2d Cir. 1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). In addition, given the broad scope of legitimate cross-examination, it may well be that their credibility would be so diminished that their direct testimony would not be very effective.

Even if it were clear that Pellon and Carilli would waive their privilege, however, it is impossible at this point to evaluate the probity of their proffered testimony. The Court has not yet heard the Government's evidence against Smith and, therefore, is not now in a position to weigh the damage, if any, to Smith's defense resulting from the loss of Pellon and Carilli's testimony. This factor, coupled with the uncertainty regarding waiver of the Fifth Amendment, make Smith's contentions too speculative to consider at this time.

Accordingly, Smith's motion (and the other motions for severance) are denied without prejudice to renewal at the conclusion of the Government's case, when the factual situation is settled and the potential of prejudice from a joint trial is more apparent.

---

**15.** Smith's attorney argues that the Court should "examine in camera the evidence." It is *not clear how this could be accomplished.* Most evidence is testimonial, and not yet given. Moreover, since Smith is a defendant in the

conspiracy count, which has 50 overt acts and involves a multitude of recordings of wire taps and bugs (not yet completely transcribed), a review of the 3500 materials and transcripts alone would take a week or more.