UNITED STATES of America, Appellant,

v.

Harry KURZER, Appellee.

No. 838, Docket 75–1437.

United States Court of Appeals, Second Circuit.

Argued March 17, 1976.

Decided April 14, 1976.

William I. Aronwald, Sp. Atty., U. S. Dept. of Justice, Washington, D. C. (Thomas J. Cahill, U. S. Atty., S. D. N. Y., New York City, Peter D. Sudler, Sp. Atty., U. S. Dept. of Justice, Lawrence B. Pedowitz and John D. Gordan, III, Asst. U. S. Attys., New York City, on the brief), for appellant.

Neal J. Hurwitz, New York City (Laurence May, New York City, on the brief), for appellee.

Before MOORE and FEINBERG, Circuit Judges, and WYZANSKI, District Judge.*

FEINBERG, Circuit Judge:

The United States appeals from an order of the United States District Court for the Southern District of New York, Morris E. Lasker, J., dismissing an indictment that

* Senior District Judge of the District of Massachusetts, sitting by designation.

charged Harry Kurzer with aiding and abetting the filing of fraudulent federal corporate income tax returns. 26 U.S.C. § 7206(2). The basis of the judge's ruling was that the Government had not proved that Kurzer's previous immunized testimony was not used in obtaining the indictment. For reasons set forth below, we remand for further proceedings in the district court.

## I

During the summer of 1972, in the course of a joint federal-state investigation of the meat industry in New York, federal authorities contacted Kurzer, who was then the accountant for several meat companies controlled by Moe Steinman, the target at that time of the investigation.[1] Kurzer's attorney and the federal prosecutor agreed that Kurzer would be interviewed by agents of the Internal Revenue Service about Steinman's activities. If the investigators were satisfied that Kurzer was being truthful and cooperative, he would receive immunity under 18 U.S.C. § 6003 [2] and would testify before a grand jury; if the investigators were not satisfied with Kurzer's cooperation, he would not receive formal immunity and would not be called to testify. In any event, Kurzer was promised that what he told the investigators would not be used against him.[3]

Kurzer met with the investigators on several occasions, and in February 1973 appeared before a federal grand jury under a formal grant of immunity. In March, the grand jury returned two indictments against Steinman. One, 73 Cr. 215, charged Steinman and others with interstate travel to promote commercial bribery and bribery of labor union officials, 18 U.S.C. § 1952, and conspiracy to commit that crime. The other, 73 Cr. 216, charged Steinman and others with 99 counts of filing false federal tax return forms, 26 U.S.C. § 7206, by padding the payrolls of various corporations with the names of persons not employed by them. Kurzer's testimony before the grand jury related only to the latter indictment.

Steinman had learned about the investigation of his activities in January 1972, and retained counsel at that time. After the indictments described above were filed in March 1973, the federal prosecutor asked Steinman's attorney if Steinman would be willing to cooperate in the investigation. Steinman rejected the offer, and indicated an intention to go to trial. When advised by the prosecutor that the investigation of Steinman would continue, the attorney asked to be informed if new evidence was uncovered, so that negotiations about cooperation could be renewed.

The investigation did continue, and in July 1973, Steinman learned that officers of meat companies with whom he had done business had "spilled the beans" to federal investigators concerning schemes involving generation of cash income by false invoices.

---

1. Kurzer had earlier met with state investigators on several occasions, but no significant information was developed.

2. This section provides:

    (a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon the request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to be-

come effective as provided in section 6002 of this part.

    (b) A United States attorney may, with the approval of the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, request an order under subsection (a) of this section when in his judgment—

    (1) the testimony or other information from such individual may be necessary to the public interest; and

    (2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

3. The Government concedes that this informal grant of immunity prevents use of the information received from Kurzer to the same extent as a formal grant of immunity.

Kurzer had been asked about such transactions when questioned by federal agents, but had denied any knowledge of them, and it is undisputed that this aspect of the case against Steinman was developed by means wholly independent of information received from Kurzer.

When Steinman learned that the Government had discovered these schemes, he testified below, "I felt that the goose was up. They got me and it was too much money." He had his lawyer inform the prosecutor that he was willing to cooperate. In August 1973, the federal and state investigators agreed to permit Steinman to plead guilty to one count of a violation of 26 U.S.C. § 7206(1),[4] and to a state misdemeanor, and to drop all other charges against him, in return for his cooperation. The indictment of Kurzer now before us was the product of information given by Steinman under this agreement.

## II

Kurzer moved to dismiss the indictment, on the theory that it was the product of his immunized testimony. *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Judge Lasker held two evidentiary hearings, at which the facts as given above were developed. At the first hearing, the Government showed only that Kurzer's testimony before the grand jury, and the information which he had given to the agents, did not concern the transaction for which he was later indicted, and that the indictment was instead the product of Steinman's testimony. It thus argued that the information which led to the indictment was from a source (Steinman) wholly independent of the information obtained from Kurzer. Judge Lasker then ruled, in an opinion dated September 8, 1975, that the indictment had to be dismissed. He found that Steinman was not a source independent of the testimony given by Kurzer under the immunity grant:

On the basis of the testimony of Kurzer and others, the grand jury indicted Steinman in March, 1973 and following his indictment, Steinman decided to cooperate with the government. . . . The government does not suggest that Steinman independently offered or would have offered evidence against Kurzer absent Kurzer's evidence against Steinman. The chain of evidence from Kurzer to Steinman and back to Kurzer thus violates the broad statutory proscription on its face and as construed by *Kastigar.*

The judge in effect held that even if the Government had not used Kurzer's testimony to develop leads which produced evidence later introduced against him, it had used his testimony to produce an indictment of Steinman which, at that stage of the proceedings, seemed in turn to have led to Steinman's cooperation and the evidence against Kurzer.

The Government then moved to reopen the hearing, so as to show that Steinman's testimony was not the product of Kurzer's earlier immunized testimony. Judge Lasker granted the motion, and it was at this later hearing that the Government developed further the facts stated above concerning the events which led to Steinman's cooperation with the Government.

After testimony from Steinman's attorney and the federal prosecutor regarding the negotiations leading to Steinman's cooperation, the Government produced Steinman himself. It was the Government's intention to have Steinman testify about his state of mind at the time he agreed to cooperate. Questioning proceeded for a time along this line, with Steinman's testimony tending to support the Government's position that it was not the March 1973 indictments, but the knowledge that the Government had evidence against him (not derived from Kurzer) from which the Government might be able to develop more serious charges than those contained in the indictments, that led Steinman to cooper-

---

4. The plea was made to an indictment filed in March 1974, rather than to the March 1973 "payroll padding" indictment, which also

charged violations of § 7206, that was the product of Kurzer's immunized grand jury testimony.

ate. After a while, however, the judge intervened. Although he admitted that language in his prior opinion [5] might have led the Government to believe the contrary, he indicated that he did not "view this case as being determined solely . . . on the basis of Mr. Steinman's motivation." As the colloquy with counsel proceeded, the judge went even further: "I don't think [Steinman's] frame of mind is relevant." After an offer of proof by the Government, the judge declined to hear the rest of Steinman's testimony.

In a second written opinion, dated November 12, 1975, Judge Lasker reasoned as follows:

> The government has not proven as it must, that Kurzer would have been indicted had he never given information to government agents or testified before the Grand Jury. There is no question that Kurzer's information and testimony set in motion the train of events which ultimately resulted in his own indictment.
>
> . . .
>
> We regard as artificial and unrealistic the government's attempt to compartmentalize the segments of the history of Steinman's prosecution. Whatever may have been Steinman's personal reaction to the relative strengths and weaknesses of the various charges in the indictment, nevertheless the immunized Kurzer testimony led the government to Steinman who in turn led the government to Kurzer.

The judge therefore adhered to his prior ruling that the indictment had to be dismissed.

### III

On appeal, the Government's principal argument is that the district court erred in refusing to hear and take into consideration Steinman's testimony that his decision to cooperate was based on factors entirely independent of the indictment to which Kurzer's testimony had contributed. The issue thus raised is how properly to apply the command of 18 U.S.C. § 6002, as interpreted in *Kastigar v. United States, supra,* to the facts of this case. While the problem is simple to state, it is difficult to resolve.

Our starting point must be the language of the statute:

> [N]o testimony or other information compelled under [a grant of immunity] (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

18 U.S.C. § 6002. Since it is uncontested that none of the testimony or information given by Kurzer while immunized was itself used in obtaining his indictment (apparently nothing Kurzer told the grand jury or the federal investigators was relevant to the charges on which he was indicted), our inquiry must focus on the parenthetical phrase in the statute: Was the information that was used to obtain Kurzer's indictment (Steinman's information) "directly or indirectly derived from" Kurzer's own immunized testimony?

The leading case interpreting this statutory language is *Kastigar v. United States,* supra. In *Kastigar,* the Supreme Court upheld the constitutionality of § 6002 against an argument that the immunity granted was not co-extensive with the Fifth Amendment privilege against self-incrimination, since § 6002 granted only "use" immunity [6] rather than the "transactional" immunity provided in prior federal immunity statutes. Quoting from *Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), the Court said:

> "Once a defendant demonstrates that he has testified, under a state grant of

---

5. "The government does not suggest that Steinman independently offered or would have offered testimony against Kurzer absent Kurzer's evidence against Steinman."

6. Or more properly, "use and derivative use" immunity. See *Kastigar,* 406 U.S. at 443, 92 S.Ct. at 1655, 32 L.Ed.2d at 215. Cf. *United States v. Dornau,* 491 F.2d 473, 478–80 (2d Cir.), cert. denied, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974).

immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." 378 U.S., at 78 n. 18, 84 S.Ct. at 1609, 12 L.Ed.2d at 695.

This burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony. 406 U.S. at 460, 92 S.Ct. at 1665, 32 L.Ed.2d at 226.

While this formulation repeats rather than defines the word "derived", it places a significant gloss upon it by putting the burden firmly on the prosecution to demonstrate that an indictment is the product of legitimate rather than tainted evidence, and by insisting that legitimate evidence be from a source "*wholly* independent of the compelled testimony." (Emphasis added.) This insistence that information to be used against the witness must be wholly independent is somewhat inconsistent with the Government's view in this case that testimony may be so used if the immunized testimony was not its "legal cause." The *Kastigar* test is stricter than that.

■■■■ For similar reasons, we are cautious of the Government's reliance on Fourth Amendment cases like *United States v. Cole*, 463 F.2d 163, 171–74 (2d Cir. 1972), cert. denied, 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1973). Determining whether evidence is tainted as the fruit of an unconstitutional search or seizure, *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 184, 64 L.Ed. 319, 321 (1920), or whether the taint is attenuated, *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963), presents many of the same problems as deciding whether the evidence used against Kurzer is derived from his prior immunized testimony. However, the two situations are distinguishable, as commentators have emphasized.[7] The reason is that the principal function of the Fourth Amendment exclusionary rule is to deter unlawful police conduct, *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 413, 86 S.Ct. 459, 463, 15 L.Ed.2d 453, 458 (1966), and it can be argued that it serves little deterrent purpose to exclude evidence which is only indirectly and by an attenuated chain of causation the product of improper police conduct. The Fifth Amendment, in contrast, is by its terms an exclusionary rule, and as implemented in the immunity statute it is a very broad one, prohibiting the use not only of evidence, but of "information", "directly or indirectly derived" from the immunized testimony. The statute requires not merely that evidence be excluded when such exclusion would deter wrongful police or prosecution conduct, but that the witness be left "in substantially the same position as if [he] had claimed the Fifth Amendment privilege." *Kastigar v. United States*, supra, 406 U.S. at 462, 92 S.Ct. at 1666, 32 L.Ed.2d at 227; *Murphy v. Waterfront Commission*, supra, 378 U.S. at 79, 84 S.Ct. at 1609, 12 L.Ed.2d at 695.[8] The terms of the statute, the policies of the Fifth Amendment, and the language of *Kastigar* thus all indicate the "heavy bur-

---

**7.** See Note, Standards for Exclusion in Immunity Cases after *Kastigar* and *Zicarelli*, 82 Yale L.J. 171, 176–78 (1972); Note, The Supreme Court, 1971 Term, 86 Harv.L.Rev. 1, 185–88 (1972).

**8.** We recognize that the Supreme Court has relied on Fourth Amendment cases in determining what evidence is excludable as the fruit of a coerced confession, *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968). But a coerced confession differs from immunized testimony. In the former situation, the likelihood of deterring police misconduct is, as in the Fourth Amendment context, a relevant consideration, while this is not so with regard to immunity, which is granted under prosecutorial and judicial supervision. Moreover, we deal here with an explicit statutory definition of the scope of the immunity provided, a factor not present in the *Harrison* context. See Yale Note, note 7 supra, at 175, 178–81. Cf. *Kastigar*, 406 U.S. at 461–62, 92 S.Ct. at 1665, 32 L.Ed.2d at 226.

den," 406 U.S. at 461, 92 S.Ct. at 1665, 32 L.Ed.2d at 226, on the Government in resisting defendant's claim here.

## IV

The general principle that emerges from this discussion is that the Government had the burden of proving to Judge Lasker that the evidence used to secure the indictment of Kurzer, i. e., Steinman's testimony, was "derived from a legitimate source wholly independent of [Kurzer's] compelled testimony." Such a determination must necessarily turn on the facts of each particular case. The cases since *Kastigar* in which appellate courts have confronted a claim that evidence was derived from immunized testimony are not very helpful in determining this case, for in none of them was it claimed that a witness' testimony derived from the immunized testimony because the witness was led to cooperate with the Government by an indictment secured through the immunized testimony.[9]

■ Judge Lasker ruled that Steinman's subjective motivation in testifying against Kurzer was "irrelevant" to this factual dispute. We disagree. If the Government had never heard of Steinman prior to Kurzer's information and first discovered Steinman's identity and ability to give information relevant to Kurzer only through talking to Kurzer, the case would be different. But on this record, the district court's finding that "the immunized Kurzer testimony led the government to Steinman who in turn led the government to Kurzer" cannot be interpreted in this sense, and if intended in this sense is clearly erroneous. It is not seriously disputed that Steinman's identity was known to the Government before it had ever heard of Kurzer, and that Steinman was a target of the investigation from its earliest stages.

But since Steinman's identity and potential value as a witness were not discovered through Kurzer, the only way in which Steinman's testimony could be derived, either directly or indirectly, from Kurzer's information is if the giving of that information contributed to Steinman's decision to testify. Steinman's motivation is thus directly relevant to the central question in this case. The Government was entitled to introduce Steinman's testimony that the indictment to which Kurzer's testimony contributed was not a factor in convincing Steinman to testify. The Government claims that Steinman would have testified against Kurzer because of the case the Government had developed against him entirely apart from Kurzer's information, even if the prior indictment to which Kurzer's information had contributed never existed. If the Government can prove that proposition to the satisfaction of the trier of fact, it has carried its burden of showing that Steinman was a source "wholly independent of the [immunized] testimony." It was therefore error for the judge to refuse to hear all of Steinman's proffered testimony, and to refuse to consider the portion he had heard.

Accordingly, the case must be remanded to the district court to hear and consider the excluded testimony in light of the principles contained in this opinion. We note that we do not hold that should Steinman testify, as the Government has indicated he will, that the March 1973 indictments were irrelevant to his decision to cooperate, this would end the matter. The district court must determine Steinman's credibility, not only in terms of his inclination to tell the truth, but also with regard to whether he is truly able to isolate the factors which convinced him to cooperate. Human motivation is often difficult to discern, and a decision is frequently the product of several concurrent influences. Moreover, other evi-

---

9. *United States v. First Western State Bank of Minot, North Dakota*, 491 F.2d 780 (8th Cir.), cert. denied sub nom. *Thompson v. United States*, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 49 (1974); *United States v. Catalano*, 491 F.2d 268, 272 (2d Cir.), cert. denied, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974); *United States v. McDaniel*, 482 F.2d 305 (8th Cir. 1973). See also *United States v. Dornau*, 359 F.Supp. 684 (S.D.N.Y.1973), rev'd on other grounds, 491 F.2d 473 (2d Cir.), cert. denied, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974).

dence in the record, such as the testimony by Steinman's attorney that the 1973 indictments "played a part" in the negotiations leading to Steinman's cooperation, tends to point away from the conclusion the Government would like us to reach. We hold only that Steinman's proffered testimony is relevant to the factual determination to be made by the district court, not that it governs the result.

### V

 We can dispose of the Government's remaining arguments more briefly. The Government claims that Kurzer forfeited his immunity by lying to the Government while immunized. The contention was apparently never raised in the district court. There is therefore nothing in the record beyond the Government's assertion, and the indictment itself, to indicate that Kurzer was less than candid in his conversations with Government agents or his testimony before the grand jury. In any event, we have held that the ordinary remedy for the Government when an immunized witness lies or fails to cooperate fully is a prosecution for perjury or for contempt, rather than abrogation of the immunity agreement and use of the information truthfully given by the immunized witness to prosecute him for other offenses. *United States v. Tramunti,* 500 F.2d 1334, 1345 (2d Cir.), cert. denied, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974). *Tramunti* permitted the Government, in a prosecution for perjury at a criminal trial, to use for impeachment purposes and as evidence of prior similar acts false testimony given by the defendant while immunized on a prior occasion. We reasoned that the immunity, like the privilege itself, covers the incriminatory truth, not the exculpatory falsehood. 500 F.2d at 1342, 1345. But the Government's argument here goes much further, for it would permit the use, if the prosecutor felt the immunized witness was not truthful in all respects, not only of the false testimony, but also of the truthful and incriminatory information given by the witness, contrary to the reasoning of *Tramunti.* We decline to go so far.

Finally, the argument, properly relegated by the Government to a footnote, that Steinman's testimony cannot be derived from Kurzer's because the evidence of a living witness can never be the fruit of some other evidence has been rejected in this circuit. *United States v. Karathanos,* 531 F.2d 26, 35 (2d Cir. 1976); *United States v. Tane,* 329 F.2d 848 (2d Cir. 1964).

The case is remanded to the district court for further proceedings consistent with this opinion.