## In re GRAND JURY PROCEEDINGS.

### Misc. No. 79–706.

United States District Court,
E. D. Pennsylvania.

Aug. 22, 1980.

Walter S. Batty, Jr., Asst. U. S. Atty., Philadelphia, Pa., for the Government.

Gilbert Abramson, Philadelphia, Pa., for the witness.

## OPINION

### LOUIS H. POLLAK, District Judge.

Asserting errors of law and fact, the Government seeks reconsideration of my order of April 25, 1980, denying the Government's motion to enforce a grand jury subpoena. The Government has presented no newly persuasive arguments in support of its motion and I continue to adhere to the views stated in my lengthy bench opinion of April 25, 1980. I will, therefore, in an order to be filed today, deny the Government's motion for reconsideration. Having, from the bench, addressed the Government's arguments in some detail, I would not ordinarily file a written opinion. But because the Government, in its motion papers, appears deeply perplexed by my reasoning, and because the issues involved may be of some general interest, I have concluded that it might be helpful to restate my views. In addition—although it does not bear directly on my denial of the Government's motion to enforce the subpoena—I will restate my reason for denying the cross–motion to quash the grand jury investigation.

I. Section 25(a)(10) of Title 11 provided, in relevant part, that the bankrupt:

I.

On September 10, 1979, the Clerk of the Court issued a subpoena directing William Rosenthal to furnish samples of his handwriting to the grand jury. The Government moved to enforce the grand jury subpoena on November 8, 1979. The motion was accompanied by an affidavit stating that the purpose of the request was to enable the grand jury to determine whether Rosenthal made endorsements on certain checks, including some drawn on accounts in the name of Pasco Tobacco. Rosenthal responded by asking that the motion to enforce be denied, and, further, that the grand jury investigating his conduct "be quashed and terminated." After oral argument on December 27, 1979, an evidentiary hearing was held on January 30 and February 5. The following is a brief account of the facts adduced at that hearing and upon which Rosenthal founds his argument:

On March 6 and March 29, 1979, William Rosenthal, the president of Pasco Tobacco Co., Inc., testified at the first meeting of creditors in the bankruptcy proceeding captioned *In re Pasco Tobacco Co., Inc.* Shortly before the March 6 meeting was adjourned, Martin Kilstein, Esq., attorney for the trustee in bankruptcy, put certain questions to Rosenthal. Rosenthal's attorney interrupted, indicating that because it appeared that the questions posed might elicit answers leading to a criminal charge, he wished to instruct his client of his Fifth Amendment right to refuse to answer. The meeting then adjourned.

The first meeting of creditors resumed on March 20, 1979. At that point Kilstein took up the inquiry which he had begun on March 6. Once again, Rosenthal's attorney raised the Fifth Amendment concerns. At that point, the bankruptcy judge made a ruling. Apparently relying on the immunity provision contained in 11 U.S.C. § 25(a)(10),[1] the bankruptcy judge directed Rosenthal to answer:

at the first meeting of his creditors, at the hearing upon objections, if any, to his dis-

THE COURT: Well, I am going to rule now . . . .

I rule that the witness must answer the question, because the testimony that he gives in this examination cannot be used against him in any proceeding, in any other criminal proceeding.

What is more, if there is such a criminal proceeding, the notes of testimony of this hearing will be impounded so that no one will be permitted to see it.

One further admonition: None of the counsel in this case may give information concerning the testimony of this witness to any criminal investigatory authority. All right.

Thus assured of immunity,[2] Rosenthal was interrogated at some length by Kilstein and he responded at length to Kilstein's questions. At the conclusion of the testimony, the bankruptcy judge directed the following:

THE COURT: All right.

It seems to me that I have a duty in this case which I will discharge by imposing on counsel for the Trustee the respon-

sibility of reporting this case if that has not yet been done to the United States Attorney.

I am not, of course, passing on whether the transactions to which the witness has testified actually took place in the way that they did take place, but it seems to me that the Trustee owes a duty as fiduciary to make a report to the United States Attorney of what appears to be an action which could be tainted with criminality.

Accordingly, my responsibility requires that I charge counsel for the Trustee with the responsibility of reporting this situation to the United States Attorney for reference to the Federal Bureau of Investigation for further examination and interrogation.[3]

Pursuant to that instruction, Mr. Kilstein, accompanied by his associate, Jonathan Ganz, Esq., went immediately to the office of the United States Attorney. There they informed Assistant United States Attorney Walter Batty of the bankruptcy judge's in-

---

charge and at such other times as the court shall order, submit to an examination concerning the conducting of his business, the cause of his bankruptcy, his dealings with his creditors and other persons, the amount, kind, and whereabouts of his property, and, in addition, all matters which may affect the administration and settlement of his estate or the granting of his discharge; *but no testimony, or any evidence which is directly or indirectly derived from such testimony, given by him shall be offered in evidence against him in any criminal proceeding*, except such testimony as may be given by him in the hearing upon objections to his discharge: . . . (emphasis added).

On October 1, 1979, the effective date of the new Bankruptcy Act, Section 25(a)(10) was apparently superseded by 11 U.S.C. § 344. See footnote 9, *infra*.

2. As noted, the bankruptcy judge, in ruling that Rosenthal was required to testify, characterized the witness' immunity as being that "the testimony . . . cannot be used against him . . . in any other [*sic*] criminal proceeding." But 11 U.S.C. § 25(a)(10) protects against both direct and derivative use. See *United States v. Dornau*, 491 F.2d 473, 479–80 (2d Cir. 1974). The Government concedes that Mr. Rosenthal was possessed of both types of immunity, and hence protected in a manner

coextensive with his Fifth Amendment privilege, at the time he testified.

3. Section 3057 of Title 18 provides:

(a) Any referee, receiver, or trustee having reasonable grounds for believing that any violations of the bankruptcy laws or other laws of the United States relating to insolvent debtors, receiverships or reorganization plans has been committed, or that an investigation should be had in connection therewith, shall report to the appropriate United States attorney all the facts and circumstances of the case, the names of the witnesses and the offense or offenses believed to have been committed. Where one of such officers has made such report, the others need not do so.

(b) The United States attorney thereupon shall inquire into the facts and report thereon to the referee, and if it appears probable that any such offense has been committed, shall without delay, present the matter to the grand jury, unless upon inquiry and examination he decides that the ends of public justice do not require investigation or prosecution, in which case he shall report the facts to the Attorney General for his direction.

Pub. L. 95–598, § 314(j), effective Oct. 1, 1979, substitutes the word "judge" for "referee" in section (a).

struction. Cognizant of the immunity statute and wary of the potential taint on evidence gathered as a result of immunized testimony, Batty did not ask Kilstein and Ganz to furnish substantive details of Rosenthal's suspect conduct; and no such information was volunteered. Nor was the Government apprised of the basis for the bankruptcy judge's conclusion that there were aspects of the Pasco bankruptcy that warranted reference to law enforcement authorities.

Following the Kilstein–Ganz interview, Batty referred the matter to the Federal Bureau of Investigation. Some weeks later, Agent Edward M. Velasco spoke with Kilstein at his office and learned from Kilstein that his initial suspicion (which arose prior to the March 9 hearing) had been triggered by his and Mr. Ganz's examination of certain Pasco checks whose endorsements seemed to them questionable. Agent Velasco then examined the books and records of Pasco Tobacco–books and records which were being held at Kilstein's law office to facilitate Kilstein's management of the legal affairs of the trustee. Eventually, Agent Velasco presented what he had found, along with additional evidence unearthed as a result of that examination, to the grand jury, in anticipation of criminal charges being brought against Rosenthal involving matters which had been the subject of his immunized testimony. At no time, however, did Agent Velasco, or any of the Government attorneys concerned with this case, read the transcript of Rosenthal's testimony, or discuss that testimony with anyone present at the time it was offered.

## II.

Rosenthal argues that because the grand jury's investigation resulted from testimony elicited pursuant to an immunity grant, and after the bankruptcy judge's explicit order to testify, the subpoena which the Government seeks to enforce, and the entire grand jury investigation from which it emerged, are fatally tainted as the product of immunized testimony.

For its part, the Government insists that it has in fact made no use of Rosenthal's immunized testimony which offends the Fifth Amendment.

In addition, the Government argues that at this stage of the investigation a district judge (a) must enforce the requested subpoena without inquiry into the legitimacy of the evidentiary foundation giving rise to the request, and, in any event, (b) may not direct the grand jury to halt its investigation of Rosenthal's conduct. Relying on *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), the Government contends that a district court may not decline to enforce a grand jury subpoena notwithstanding that it may be based on evidence unconstitutionally received. And relying on *In re Grand Jury Proceedings [U.S. Steel–Clairton Works]*, 525 F.2d 151 (3d Cir. 1975), the Government further contends that a district court may not interfere with a grand jury's on–going investigation. The witness' Fifth Amendment claim is thus characterized by the Government as not yet "ripe" for judicial consideration.

### A.

In *United States v. Calandra, supra*, the Supreme Court held that a witness may not refuse to answer questions posed by a grand jury on the ground that those questions are based on evidence obtained through an illegal search and seizure. The Court thus rejected the witness' argument that the exclusionary rule, which prohibits the use of unlawfully seized evidence in a criminal trial, similarly prohibits such use in the grand jury. The Court first determined that application of the exclusionary rule to grand jury proceedings would substantially impede the "effective and expeditious discharge of the grand jury's duties." 414 U.S. at 350, 94 S.Ct. at 621. The Court then considered the potential benefit of extending the rule to grand jury proceedings–the incremental deterrent effect on future unlawful police behavior–and found that benefit insufficient when measured against potential harm to the grand jury's processes.

Explicit in the Court's analysis was its view that the exclusionary rule "is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." 414 U.S. at 348, 94 S.Ct. at 620.

In contrast, this case does not involve the application of a judicial artifact designed to effectuate Fourth Amendment policy. Rosenthal's claim here rests squarely on the Fifth Amendment and on a statute prohibiting the use of testimony compelled as a result of an immunity grant. Faced with such a claim, there is no occasion to weigh the interest of grand jury efficiency, substantial as that may be. Rather, the court's duty is to construe–and, if found applicable, apply–the textual command of the statute and the Constitution. Cf. *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972) (statutory bar on the use of evidence derived from unlawfully intercepted wire communications shields a grand jury witness from questions based on such communications). Compare *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (allowing the impeachment use of a confession taken in violation of the *Miranda* rules) and *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) (allowing impeachment use of unconstitutionally seized evidence) with *New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979) (prohibiting impeachment use of immunized testimony).

In considering whether "attenuation of the taint" principles developed under the Fourth Amendment's exclusionary rule could be applied to the question whether an indictment had been "derived" from immunized testimony, the Court of Appeals for the Second Circuit, in *United States v. Kurzer*, 534 F.2d 511, 516 (1970), noted the significant difference in the operation of the Fourth and Fifth Amendments:

[T]he two situations are distinguishable, as commentators have emphasized. The reason is that the principal function of the Fourth Amendment exclusionary rule

is to deter unlawful police conduct . . . and it can be argued that it serves little deterrent purpose to exclude evidence which is only indirectly and by an attenuated chain of causation the product of improper police conduct. The Fifth Amendment, in contrast, is by its terms an exclusionary rule, and as implemented in the immunity statute it is a very broad one, prohibiting the use not only of evidence, but of "information," "directly or indirectly derived" from the immunized testimony. The statute requires not merely that evidence be excluded when such exclusion would deter wrongful police or prosecution conduct, but that the witness be left "in substantially the same position as if [he] had claimed the Fifth Amendment privilege." *Kastigar v. United States, supra*, 406 U.S. [441] at 462, 92 S.Ct. [1653] at 1666, 32 L.Ed.2d [212] at 227. [Footnotes and some citations omitted.]

The *Calandra* Court had no difficulty rejecting the witness' argument that "each and every question based on evidence obtained from an illegal search and seizure constitutes a fresh and independent violation of the witness' constitutional rights." 414 U.S. at 353, 94 S.Ct. at 622. The Court reasoned that the wrong sought to have been prevented by the Fourth Amendment—unreasonable governmental intrusion on the privacy of an individual—was a *fait accompli* at the time the witness raised his objection. "Questions based on illegally obtained evidence are only a derivative use of the product of a past unlawful search and seizure. They work no new Fourth Amendment wrong. Whether such derivative use of illegally obtained evidence by a grand jury should be proscribed presents a question, not of rights, but of remedies." 414 U.S. at 354, 94 S.Ct. at 623.

But the harm which the Fifth Amendment is designed to forestall is not accomplished when the witness is compelled to testify—though the element of compulsion is necessary to any Fifth Amendment claim—but when compelled testimony is used against the testifier in a criminal pros-

ecution. That is why a witness may be directed to testify once the threat of future prosecution has been foreclosed. And that is why immunity statutes—which permit the Government to compel testimony provided such testimony, or evidence derived therefrom, will not be used in a later criminal proceeding—pass Fifth Amendment scrutiny. Each new use of immunized testimony in a criminal case, whether direct or derivative, occasions a distinct wrong under the immunity statutes and the Constitution.

■ The Government concedes, as it must, that a grand jury proceeding is a "criminal case" as that term bears upon the application of the Fifth Amendment, see *Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 197, 35 L.Ed. 1110 (1892) and a "criminal proceeding" as that term is used in 11 U.S.C. § 25(a)(10), cf. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Nonetheless, the Government, on behalf of the grand jury, seeks to enlist the aid of the district court in gathering information against an immunized witness, and asserts that the court may not entertain the witness' objection that this would constitute a prohibited use of the immunized testimony. But to lend the court's authority to the production of further evidence in a proceeding tainted by

a transgression of the witness' statutory and constitutional immunity would not be to add a derivative infringement to an already accomplished Fourth Amendment wrong but to compound and proliferate the infringement of the Fifth Amendment's prohibition on the compelling of incriminatory testimony. Indeed, it would pose the danger of "entangl[ing] the courts in the illegal acts of Government agents," *Gelbard v. United States*, 408 U.S. at 51, 92 S.Ct. at 2363. Rosenthal is directly burdened by the grand jury's subpoena and his interest in the constitutional controversy is both personal and concrete.[4] His Fifth Amendment defense to the subpoena is properly considered at this time.[5]

### B.

Rosenthal asked that I explore his Fifth Amendment claim, not only as a defense to the grand jury subpoena, but in order to assemble a factual predicate for his motion to restrain the grand jury's investigation of his actions in connection with Pasco Tobacco.

■ Because the grand jury possesses no power of its own to effect compulsory process, it necessarily relies on the authority of the court in aid of its investigative function. See *Brown v. United States*, 359 U.S., 41,

4. Rosenthal has clearly alleged a protected interest in avoiding a violation of the Fifth Amendment and the immunity statute, and a direct and imminent harm if he is forced to comply with the grand jury's subpoena. This case does not present the more difficult questions (1) whether the target of a grand jury investigation which is the product of his immunized testimony may interpose an objection to a subpoena directed at a third party or, (2) whether a third party might have standing to raise the claim of the immunized target.

5. Initially, the Government phrased its argument in terms of the "ripeness" of Rosenthal's claim, asserting that the proper time to raise an objection of this kind would be after indictment, by way of motion to suppress evidence ("*Kastigar* hearing"), or perhaps, although the Government does not concede that this would be appropriate, by way of motion to dismiss the indictment. In this regard, it should be noted that *United States v. Calandra*, upon which the Government places principal reliance, addressed the reach of the exclusionary remedy, and not the questions of constitutional

and prudential justiciability usually associated with the doctrine of ripeness. To the extent it speaks at all to the matter of timing Fifth Amendment objections, *Calandra* directs a result contrary to that sought by the Government.

It is not the rule that because a grand jury witness may have the opportunity to raise his objection at some later time, he may not interpose his Fifth Amendment objection at the time of the question calling for the incriminating response. As the Court noted in *Calandra*, "[T]he grand jury may not force a witness to answer questions in violation of that constitutional guarantee . . . Judicial supervision is properly exercised in such cases to prevent the wrong before it occurs." 414 U.S. at 346, 94 S.Ct. at 619. At least where the target of the subpoena is also the target of the investigation, as is the case here, the harm resulting from a derivative use of immunized testimony is also appropriately confronted when it is imminent, but before it occurs.

49, 79 S.Ct. 539, 545, 2 L.Ed.2d 589 (1959). But the grand jury is, in many respects, an investigative and prosecutorial arm of the executive branch, whose operations are not subject to direct judicial supervision. *In re Grand Jury Proceedings [Schofield I]*, 486 F.2d 85, 90 (3d Cir.1973). While the court is charged with the responsibility of summoning the grand jury, and may perform certain essentially ministerial functions in that regard, the court is without any direct authority to stay the proceedings of the grand jury, or to set limits on the scope of its inquiry. *In re Grand Jury Proceedings [U.S. Steel-Clairton Works]*, 525 F.2d 151 (1975).

Rosenthal's position is that the grand jury was convened, and received evidence, as a direct result of his immunized testimony, and that he is the sole target of the grand jury's investigation. He has argued that he is besmirched by the grand jury's continuing investigation, and that, if he is indicted, the indictment would be fatally tainted. Building on language from *United States v. Calandra*, he has advanced the argument that because "[j]udicial supervision is properly exercised in such cases to prevent the wrong before it occurs," 414 U.S. at 346, 94 S.Ct. at 619, a court may act to forestall the eventuality of an indictment whose illegality is a foregone conclusion.

■ But it is clear that the language which Rosenthal draws from *Calandra* does not sanction such a broad prophylactic role for the district courts. A court may consider a witness' Fifth Amendment claim as defense in a proceeding involving the failure to respond to a grand jury's questions. And a court may refuse to enforce a grand jury's subpoena to avoid compounding a constitutional wrong. Thus, Rosenthal may invoke the power of the court to relieve him of the burden of complying with a grand jury subpoena—if indeed that subpoena is the product of his immunized testimony. But the court may not anticipate the outcome of the grand jury's investigation—

"whether indictments would issue, or, if issued, against whom and for what violations." *In re Grand Jury Proceeding*, 525 F.2d at 157; see *Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919). Absent some imposition on his person or privacy, the fact that an individual is the target of an investigation, conducted in secret, does not present the kind of concrete and cognizable harm upon which so intrusive an intervention as that contended for here might be based.[6] Cf. *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). Thus, under the circumstances of this case, Rosenthal is not entitled to halt the grand jury's investigation.

## III.

We now turn to the mixed question of law and fact which lies at the heart of Rosenthal's claim—whether the grand jury's subpoena entails a use of immunized testimony that is prohibited by 11 U.S.C. § 25(a)(10) and the Fifth Amendment.

■ The Government initially asserted that the link in the chain of "but for" causation, commencing with the bankruptcy judge's injunction to Kilstein and Ganz to visit the office of the United States Attorney, did not sufficiently connect with the challenged subpoena. Noting the fastidious care with which Rosenthal's actual testimony has been kept from the grand jury, the Government has contended that the "non—evidentiary derivative use" of the testimony is beyond the scope of the prohibition explicit in Rosenthal's grant of immunity: The argument is that, absent any communication of the substance of the testimony elicited pursuant to the immunity grant, the Fifth Amendment is not violated.

The Government's narrow reading of the scope of immunity is, however, without support in the case law or in the logic of immunity theory. Section 25(a)(10) of Title 11 prohibits the introduction of "evidence which is directly or indirectly derived from"

---

**6.** There is some authority for the propriety of less intrusive intervention in the grand jury process to vindicate a meritorious Fifth Amendment claim. *In re Fried*, 161 F.2d 453 (2d Cir. 1947).

immunized testimony. The language used in the statute is designed to obviate the possibility that compelled testimony will lead to the infliction of criminal penalties on the witness. To qualify in its role as a surrogate for the Fifth Amendment, the immunity statute must afford "the same protection by assuring that the compelled testimony can *in no way* lead to the infliction of criminal penalties." (Emphasis added). *Kastigar v. United States*, 406 U.S. 441, 461, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972). Thus, the statute prohibits not only evidentiary use of compelled testimony, but its use as an investigatory lead, and bars "the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosure." 406 U.S. at 460, 92 S.Ct. at 1665. This is precisely the use which the Government made of the limited information which had been furnished to it by Kilstein. Notwithstanding that Kilstein did not reveal the details of Rosenthal's testimony, the simple fact is that the investigation was commenced as the direct result of the Kilstein–Ganz visit. A "but for" test of causation is precisely what is contemplated by the immunity statute in order to ensure that an immunized witness is not placed in a position of greater peril than the one he would have occupied had he been allowed to avail himself of the protection afforded by the privilege against compulsory self–incrimination.[7]

In addition, the Government has attempted to shoulder "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." 406 U.S. at 461–62, 92 S.Ct. at 1665. To do so, the Government has offered the testimony of Kilstein and Ganz in order to demonstrate that they would have brought the matter to the attention of the Government investigatory authorities even if (a) they had not been privy to the immunized testimony and (b) they had not been ordered to do so by the bankruptcy

judge. The following is a summary of the relevant Kilstein–Ganz testimony:

In late January or early February of 1979, in the course of their review of the books and records of Pasco Tobacco, in preparation for the March hearing before the bankruptcy judge, Kilstein and Ganz came across certain checks which, from the form of their endorsement, the names of the respective payees, and the account on which they were drawn, appeared suspicious. Ganz testified that he was aware of a statutory obligation on the trustee (and hence his lawyers) to bring matters which suggested the possibility of criminal violations to the attention of the proper authorities, and that in light of this obligation it appeared to him that he and Kilstein would have to bring this matter to the attention of the Internal Revenue Service as a possible tax fraud. But Ganz had not formulated any definite plan as to when and how he would do so. As the first meeting of creditors approached, his primary obligation, as he understood it, lay on the civil side of the matter—in assisting the trustee in gathering assets for the bankrupt estate. He did expect, however, that Rosenthal's testimony at the first meeting of creditors would either confirm or alleviate concerns about the possible criminality of Rosenthal's conduct, and thus bear upon the ultimate Ganz–Kilstein decision whether or not to refer the matter to the I.R.S.

■ Rosenthal has noted that, under the circumstances of this case, the clear impetus for the commencement of the Government's investigation came not from the attorneys for the trustee, but from the bankruptcy judge himself—and that the bankruptcy judge knew nothing about possible violations of the bankruptcy laws in this case except what he heard in the course of the immunized testimony. Thus, in Rosenthal's view, the intentions of Kilstein and Ganz would not be pertinent to the inquiry the

---

7. The Government argues that the suitability of the "but for" test is belied by the rule that a perjury prosecution may be based on, and proved through, the use of immunized testimony. But it is clear that the theoretical basis for

the perjury exception is not grounded in the concept of "non–evidentiary derivative use" which the Government advances here. *United States v. Apfelbaum*, 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980).

court must undertake. And indeed, Rosenthal's argument is not without support in the language of the relevant cases. Once it is demonstrated that a witness has testified under a grant of immunity, the Government's responsive burden of proof "is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar v. United States*, 406 U.S. 441, 460, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212.

The Government answers Rosenthal's contention that its investigation is not "wholly independent of the compelled testimony," by offering *United States v. Weiskopf*, No. 77 Cr. 686 (S.D.N.Y., June 30, 1978), aff'd 594 F.2d 853 (2d Cir. 1978), *cert. denied*, 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979), as a model for the relevant inquiry. *Weiskopf* involved a factual circumstance similar in many respects to that presented here. Judge Owen concluded in *Weiskopf* that the reference of a matter for possible criminal prosecution to the United States Attorney, made by the attorney for the trustee in a bankruptcy action after having heard immunized testimony at a first meeting of creditors, had not tainted the ensuing criminal investigation of the immunized witness. In reaching that conclusion, Judge Owen relied in part on the fact that the trustee had a statutory obligation to make the reference if he had reasonable grounds for believing that there had been a violation of law, and that he indeed had adequate grounds for such a belief.[8] More significantly, Judge Owen found "no basis, on this record, for the argument that Bernice Weiskopf's testimony on October 20, 1975 played any part in Mr. Margolis' decision to refer the matter pursuant to 18 U.S.C. § 3057." *United States v. Weiskopf*, 77 Cr. 686, p. 4, n. 5.

But while, on the facts in *Weiskopf*, the court was able to conclude that the reference of the matter to the United States Attorney by the attorney for the trustee had not been tainted by the attorney's exposure to immunized testimony, no similar conclusion would apply to the facts of this case. The record is clear that whatever may have been Kilstein's and Ganz's intention to report the matter at some later time, their visit to the United States Attorney's office on March 29, 1979, was not an exercise of their independent judgment but an undertaking prompted by a judicial directive. And it is equally clear that the bankruptcy judge whose directive was the catalyst for the report, had no information about possible criminality until he listened to Rosenthal's immunized testimony. Thus, the Government has not demonstrated that its evidence was actually derived from a legitimate, wholly independent source.

The contrast between the facts of this case and those of *Weiskopf* highlights the nature of the hurdle the Government must surmount in order to overcome the presumption of taint. The Government has sought to demonstrate that the attorneys for the trustee would ultimately have provided a source of independent information whether or not Rosenthal had given immunized testimony. Rosenthal has criticized this attempted demonstration as speculative in that it requires the court to answer an essentially hypothetical question. But while the inquiry is difficult, it appears to be precisely the inquiry a court must undertake in these circumstances. See *United States v. Kurzer*, 534 F.2d 511, 517 (2d Cir. 1976). The immunity statute is designed to afford protection as broad as, but no broader than, that offered by the Fifth Amend-

---

8. The Government urges here that Kilstein and Ganz also possessed reasonable grounds for that belief, and were equally under the injunction of 18 U.S.C. § 3057(a) to report their suspicions to proper authorities. But while it is tempting to assume that such an injunction will be followed to the letter, we must be cautious in equating the probability that legal rules will be implemented, with the near certainty that

the Fifth Amendment requires. (By way of comparative illustration: Section 3057(b) imposes a duty on the United States Attorney to report to the bankruptcy judge the results of his investigation, but the Assistant United States Attorney in charge of this case forthrightly acknowledged, in the course of his able argument, that he made no such report.)

ment. *Kastigar v. United States*, 406 U.S. at 459, 92 S.Ct. at 1664. If it could be demonstrated with the requisite degree of certainty that a reference would have been made notwithstanding the immunized testimony, then Rosenthal would stand in no worse position than he would be in had he been allowed to insist on his right of silence. No harm would have befallen him which the Fifth Amendment might have guarded against, and, thus, there would be no constitutional infirmity in the subpoena.

The Government has the "heavy burden" of disproving taint. 406 U.S. at 461, 92 S.Ct. at 1665. This burden would appear to be at its heaviest in an instance where, as here, it has been determined that the actual sequence of events was one inconsistent with the statutory and constitutional mandate and the court is asked to consider the probability that an alternate and legitimate pathway would have been created. The Government attempted to shoulder that "heavy burden" through the testimony of Kilstein and Ganz. My decision must therefore rest on an evaluation of their concurrent testimony that they probably would in any event have reported the matter to the proper authorities. This involves a type of credibility assessment; but I emphasize that what is at issue is not "credibility" in the usual sense—for I have no difficulty concluding that the testimony of Kilstein and Ganz was an entirely honest attempt to recollect their states of mind prior to the March 29 meeting. Rather, it is necessary that their credibility be assessed—as the Second Circuit so cogently put the matter in *United States v. Kurzer*—

> with regard to whether [they were] truly able to insulate the factors which convinced [them to bring the matter to the attention of the United States Attorney.] Human motivation is often difficult to discern, and a decision is frequently the product of several concurrent influences.

534 F.2d at 517. Indeed, in considering the testimony of Kilstein and Ganz, I am obliged to recognize that both the process of recollection and the process of self–prediction are highly likely to be affected, to the point of taint, by the sure knowledge of what ought to be, and ought to have been, done.

█ Having heard the testimony of Kilstein and Ganz, I acquiesce in the view that there was a very real likelihood that they would have made the reference. But I am not persuaded, with the degree of conviction I believe is required, that they almost certainly would have so acted. Before the first meeting of creditors they felt, on a tentative basis, that they would have to refer their suspicions to law enforcement authorities. But in the weeks preceding the first meeting of creditors, they made no attempt to discuss the matter with law enforcement personnel. According to their own testimony, Kilstein and Ganz perceived the first meeting of creditors as an occasion on which Rosenthal would give testimony which might alleviate their concerns; if not, they would go forward with the reference. Yet neither one of them had yet fixed with any definiteness the time for rendering their report, nor indeed had they determined to which law enforcement authority—the Internal Revenue Service or the United States Attorney—such a reference should be made. As attorneys for the trustee, they remained principally concerned with their obligation on the civil side of the matter—gathering assets for the bankrupt estate. At least until their intentions relative to the possible criminal aspects of the case had been crystallized in a definite plan, any number of factors might have conspired to waylay them on the road to the performance of what they recognized as their legal obligation to make a report. In short, I continue to hold the view I expressed on April 25, 1980, that the Government has not met its heavy burden in this case of showing that, aside and apart from the tainted reference it did receive, the Government almost certainly would have obtained a comparable investigatory lead from an entirely wholesome source.

## IV.

If the Government is to be permitted to supplant the protection of the Fifth Amendment by compelling testimony through a grant of immunity, it is vital that each witness be assured that his truthful

testimony will not lead to the very harms the Fifth Amendment was intended to guard against.[9] The Government's motion for reconsideration will be denied.[10]

9. Somewhat troubling is the fact that Rosenthal's grant of immunity was not the product of careful prosecutorial decision–making–weighing the evidentiary use of the desired testimony against the possibility of tainting the prosecution of a possible felony. That no such evaluation was undertaken here was not the fault of any of the participants in the drama detailed above. Rather, it appears to show that there are substantial attendant difficulties in a process such as that mandated by Section 25(a)(10) which confers an automatic immunity upon certain classes of witnesses. *See Organized Crime Control Act of 1970 in Bankruptcy Proceedings,* 46 *Am.Bank.L.J.* 1, 16–24 (1972). Section 25(a)(10) appears to have run its course: Effective October 1, 1979, the new Bankruptcy Act established that the granting of immunity in bankruptcy proceedings will conform to the general practice that the initiative to grant immunity must come from the Department of Justice. 11 U.S.C. § 344.

That a grant of immunity is inadvertent or ill considered, or that the Government's exposure to immunized testimony or the fruits thereof may have been accidental or otherwise innocent, does not in any way militate against the result reached herein. Cf. *United States v. McDaniel,* 482 F.2d 305 (8th Cir. 1973).

10. The Government, in its extensive supplemental memorandum canvassing much of the ground covered in my bench opinion (and now recapitulated in this written opinion), makes the further argument that the ruling announced from the bench is untenable unless supported by a finding "that Rosenthal's testimony--as opposed to the questions or exhibits--caused the bankruptcy judge to issue the directive" that the matter be referred to the United States Attorney. The Government insists that on the present record "the only reasonable inference . . . is that the possibilities of criminal misconduct were so obvious upon an examination of the checks that Rosenthal's testimony could have made no difference either to the attorneys for the receiver [*sic*] or to [the bankruptcy judge] in their deciding that the case should be referred to the prosecutor." Against the possibility that I may not be persuaded that the record permits only that inference, the Government seeks leave to reopen the record in order to call the bankruptcy judge--and perhaps

to re-call Messrs. Kilstein and Ganz–to address this issue.

I am not persuaded that the record compels the inference contended for: (1) Since Kilstein and Ganz went to the United States Attorney's office immediately after Rosenthal's testimony, not on their own initiative, but at the instance of the bankruptcy judge, their thoughts are of no moment apart from the alternate pathway context considered *supra* pp. 986–988 (although it bears recalling that Ganz testified that in advance of the first meeting of creditors he anticipated that Rosenthal's testimony would bear on his and Kilstein's ultimate decision whether or not to refer the matter to law enforcement authorities). (2) That the bankruptcy judge was totally impervious to the substance of Rosenthal's just–concluded testimony when he directed the referral does not seem to me compatible with (a) the fact that the bankruptcy judge expressly alluded to "the transactions to which the witness has testified" when directing referral, and (b) the further fact (disclosable without disclosing the substance of Rosenthal's still-impounded immunized testimony) that the bankruptcy judge participated in the questioning of Rosenthal.

The Government's proposal to reopen the record with a view to calling the bankruptcy judge as a witness does not seem to me fruitful. Having the burden of proving that the subpoena it seeks to enforce is not tainted by Rosenthal's immunized testimony, the Government elected not to call the bankruptcy judge in support of its contention that there was no taint. The Government's decision may have rested in part on an institutional perception that in the generality of cases the reasons for judicial action should be gleaned from the formal record, not from the judge's recollection of his or her unannounced rationale of decision. See *United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). If the Government does not now feel that the institutional constraints on judicial testimony are compelling, it has nonetheless failed to persuade me that there is testimony which could be forthcoming which, at this belated stage, would meet the Government's heavy burden of demonstrating that the reference to the Office of the United States Attorney was wholly independent of the compelled testimony.